UNITED STATES of America

v.

RICKUS, Robert F.

UNITED STATES of America

v.

NAZAROK, Dennis M.

Appeal of UNITED STATES of America.

No. 83–1698.

United States Court of Appeals,
Third Circuit.

Argued March 7, 1984.

Decided June 18, 1984.

---

Thomas H. Lee, II, Asst. U.S. Atty. (argued), Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief Appeals, Philadelphia, Pa., for appellant.

Lawrence J. Richette, Philadelphia, Pa., for Robert F. Rickus.

Carol A. Koller, Asst. Defender (argued), Edward H. Weis, Atty. in Charge, Defender Ass'n of Philadelphia, Philadelphia, Pa., for Dennis M. Nazarok.

Before HUNTER and BECKER, Circuit Judges, and HOFFMAN,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This case arises from an early morning stop and search of an automobile. A search of the automobile trunk revealed a loaded .22 caliber semi-automatic pistol, and the police arrested the car's occupants, defendants Robert Rickus and Dennis Nazarok. The defendants were subsequently indicted under 18 U.S.C.App. § 1202(a)(1) (1982), which prohibits the possession of firearms by convicted felons. Both defendants filed pre-trial motions to suppress the evidence seized during this stop, arguing that the stop and the subsequent search were unlawful. The district court, 566 F.Supp. 96, ordered that the evidence seized from the trunk of the car be suppressed. The United States has taken this interlocutory appeal from the district court's order, as authorized by 18 U.S.C. § 3731 (1982).

### I. *Background*

At approximately 3:30 on the morning of June 27, 1982, Officer Halpin was sitting in his patrol car in a parking lot in the business district of Richboro, Pennsylvania. He observed a black and gold Buick traveling up the highway and then, thirty minutes later, observed what he believed to be the same car traveling back again. At the time of the second sighting, the car was moving extremely slowly past the closed stores of the commercial district. Halpin followed the vehicle as it drove through the commercial district and into a nearby residential area. Aware that the residential area had recently been victimized by as many as twelve unsolved nighttime burglaries, although none had been reported that night, Halpin called for assistance in following the car. Sergeant Quaste and Officer Berwind, who were patrolling nearby in an unmarked police car, responded to the call. Both police cars followed the Buick through the residential area for several minutes. During that time, the car continued to travel slowly. At one point, it stopped momentarily in front of a residence. Finally, when the car made a legal U-turn, to return in the direction from which it had come, Halpin pulled in front of the car and stopped it. Quaste and Berwind continued on in their car.

As Halpin approached the car, the driver, defendant Nazarok, got out of the car. When Halpin asked Nazarok for identification, Nazarok responded that he did not have his driver's license or any other identification with him. Halpin then asked the passenger, defendant Rickus, for identification. Rickus at first did not acknowledge the request and remained motionless in the car. After Halpin again asked him for identification, Rickus responded that he had none. Nazarok eventually produced from the car's glove compartment a no-fault insurance card bearing the name of Bernadette Nazarok. While Nazarok was searching for the insurance card, Halpin illuminated the car's interior with his flashlight. He noticed some pliers and a screwdriver on the floor behind the driver's seat, a flashlight on the floor in the front passenger area, and roadmaps on the front seat.

When Halpin asked Nazarok and Rickus where they had been, they replied that they had been drinking at several bars. Neither, however, could remember the name or location of any of the bars, and Halpin could not detect any odor of alcohol on Nazarok's breath. Throughout this questioning, both defendants repeatedly exchanged glances and generally acted in what was characterized as a nervous manner.

While Halpin was talking to the defendants, Quaste and Berwind returned to the scene and got out of their car. At one point, as Halpin questioned Nazarok, Quaste noticed Rickus slowly backing away from the car. Quaste told Rickus to return

---

* Honorable Walter E. Hoffman, United States District Judge for the Eastern District of Virgin- ia, sitting by designation.

to the car. Rickus later started to back away from the car and again was told to return to the car. While Halpin was questioning the defendants, he noticed a bulge in the left pocket of Nazarok's jacket and the top of a bullet proof vest sticking above the jacket. After Halpin had several times asked Nazarok to remove his jacket, Nazarok finally complied—revealing a full upperbody bullet-proof vest. At this point, both men were asked to face the Buick and place their hands on it while they were patted down. Quaste then searched the car's interior and found, among other things, the screwdriver, pliers, flashlight and map previously seen by Halpin, a hunting knife, and a pair of brown work gloves. He also discovered two pairs of surgical gloves in the pocket of Nazarok's jacket, which had been handed to him. When asked why he and Rickus were wearing bullet-proof vests, Nazarok stated that they were going to "hit" a drug dealer, but the deal "had gone sour."

Quaste then removed the keys from the ignition, opened the trunk, and there found a loaded .22 caliber semi-automatic pistol and a mask of Leonid Brezhnev.

Nazarok and Rickus were placed under arrest and subsequently charged in federal court with "possession of a firearm by a convicted felon," in violation of 18 U.S.C. App. § 1202(a)(1) (1982). Prior to trial both defendants filed motions to suppress the evidence seized from their persons and their car, and to suppress Nazarok's statement about "hitting" the drug dealer.

The district court concluded that the initial stop and the search of the passenger compartment were both lawful, and that the evidence obtained therefrom would not be suppressed. It ordered that Nazarok's statement about "hitting" a drug dealer be suppressed after concluding that it was the result of a custodial interrogation which took place prior to giving Nazarok his *Miranda* warning. Finally, it determined that Pennsylvania law governed the validity of the warrantless search of the car's trunk and that under Pennsylvania law there was not probable cause to search the trunk. The court therefore ordered that the evidence seized from the trunk be suppressed.

The Government moved for reconsideration of that part of the order suppressing the evidence seized from the trunk. It specifically requested the court to reconsider its conclusion that Pennsylvania law governed the validity of the search, and urged that the trunk search was permitted by the rule announced in *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). In its second Memorandum and Order, the trial court determined that even if federal law applied, the trunk search was unlawful because federal law requires, and the police lacked, probable cause to believe that the trunk itself contained contraband or evidence of a crime, 570 F.Supp. 1235.

In this appeal, the Government argues that federal law governs the validity of the trunk search, and that this search was valid under federal law. Specifically, it argues that under the rule announced in *Ross*, the police did not need to believe that the trunk itself, as opposed to the car as a whole, contained contraband. We agree. We will therefore reverse that portion of the district court's order suppressing the evidence found in the trunk.

## II. *The Applicable Law*

We first address the district court's determination that Pennsylvania law governed the validity of the trunk search. It is a general rule that federal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law. *United States v. Shaffer*, 520 F.2d 1369, 1372 (3d Cir.1975), *cert. denied sub nom. Vespe v. United States*, 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976). *See United States v. Armocida*, 515 F.2d 49, 52 (3d Cir.), *cert. denied sub nom. United States v. Gazal*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *cf. United States v. Bedford*, 519 F.2d 650, 654–55 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976). Thus evidence obtained in accordance with federal law is admissible in fed-

eral court—even though it was obtained by state officers in violation of state law. *See Shaffer,* 520 F.2d at 1372. Although recognizing this general rule, the district court held that an exception exists where state agents have violated state constitutional, as opposed to state statutory, law.

■ We can find no authority for the existence of this exception.[1] Nor are we persuaded to fashion such an exception to the general rule that federal law governs the admissibility of evidence in federal trials. Proposed extensions in the scope of the exclusionary rule are approached cautiously, for, "[c]learly, the enforcement of admittedly valid laws would be hampered by ... extending the exclusionary rule, and, as is nearly always the case with the rule, concededly relevant and reliable evidence would be rendered unavailable." *United States v. Janis,* 428 U.S. 433, 447, 96 S.Ct. 3021, 3029, 49 L.Ed.2d 1046 (1975). We believe that the extension here proposed would be costly and unwise: "if the states could require federal courts to exclude evidence in federal criminal cases, some convictions would undoubtedly be lost, and the enforcement of congressional policy would be weakened." *Shaffer,* 520 F.2d at 1372.

We are not insensitive to the claim that we should not encourage state officials to violate principles central to the state's social and governmental order. *See United States v. Sotomayor,* 592 F.2d 1219, 1225 (2d Cir.), *cert. denied sub nom. Crespo v. United States,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). But sanctions already exist to control the state officer's conduct. He is "punished" by the exclu-

sion of evidence in the state criminal trial, *see Janis,* 428 U.S. at 448, 96 S.Ct. at 3029, and the state can, if it chooses, enforce its policies with respect to its own officers by permitting civil suits. *See Shaffer,* 520 F.2d at 1372. We are persuaded that the additional deterrent effect to be gained from excluding this evidence in federal trials for federal offenses is small, and is far outweighed by the costs to society of excluding the evidence. Applying the exclusionary rule in this instance would thus violate the principle that the rule is a " 'needed, but grud[g]ingly taken, medicament ... [of which] no more should be swallowed than is needed to combat the disease.' " *Janis,* 428 U.S. at 454–55 n. 29, 96 S.Ct. at 3032 n. 29 (quoting Amsterdam, *Search, Seizure, and Section 2255: A Comment,* 112 U.Pa.L.Rev. 378, 388–89 (1964) (footnotes ommitted)). We therefore conclude that federal law governs the validity of the trunk search, and that the district court erred in applying Pennsylvania law to assess its validity.[2] We turn now to examine the challenged stop and search under federal law.

### III. *The Stop and Search*

The district court determined that the initial stop of defendants' automobile was proper, and that the police had probable cause to search the passenger compartment. The district court ruled, however, that the police did not have probable cause to search the trunk where the loaded weapon was discovered. The government contends in this appeal that the trunk search was proper, and that the weapon found thereby is admissible. Defendants urge us to affirm the district court's suppression order, both because the trunk search itself

---

1. The cases relied on by the district court, *Oregon v. Hass,* 420 U.S. 714, 719–20, 95 S.Ct. 1215, 1219–20, 43 L.Ed.2d 570 (1975), and *United States v. Bedford,* 519 F.2d 650, 654 n. 3 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976), are not support for the existence of such an exception. They stand merely for the proposition that a state court "may interpret a feature of state constitutional law more restrictively than the Supreme Court has interpreted an equivalent provision of the Federal Constitution." *Bedford, id.* Neither case considers whether a federal court is ob-

liged to enforce, by means of the exclusionary rule, state constitutional restrictions on police activity greater than those imposed by federal law.

2. We note that this case does not require us to assess the validity of an *arrest* by state officers. Thus, we need not address the rule set forth in *United States v. DiRe,* 332 U.S. 581, 587–92, 68 S.Ct. 222, 225–27, 92 L.Ed. 210 (1948), as followed by this court in *United States v. Day,* 455 F.2d 454 (3d Cir.1972).

was unlawful, and because the initial stop, which led to the trunk search, was unlawful. We will examine the lawfulness of the seizure in issue as it progressed from the initial stop through the trunk search.

Defendants argue first that the initial automobile stop was not supported by a reasonable suspicion and that the items found in the trunk were therefore properly suppressed as the fruits of an illegal stop under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We disagree.

■■■ It is well established that an investigatory stop short of an arrest is valid if based upon a reasonable suspicion that criminal activity is afoot. *See Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). *See also Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). Reasonable suspicion must be based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. *See also Brignoni-Ponce*, 422 U.S. at 884, 95 S.Ct. at 2582; *Michigan v. Summers*, 452 U.S. 692, 699, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981). In determining whether a stop is justified, the court must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers. *See United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *Brown v. Texas*, 443 U.S. at 52 n. 2, 99 S.Ct. at 2641 n. 2. Finally, such an investigative stop must be "reasonably related in scope to the justification for its initiation." *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884, *accord Brignoni-Ponce*, 422 U.S. at 881, 95 S.Ct. at 2580.

■■■ Judged by these standards, we believe that the stop effected in this case was lawful. Defendants were traveling through a closed business district at 3:30 in the morning at a speed 15–20 miles per hour below the posted speed limit when first they aroused Officer Halpin's suspicions. They then turned into a residential area that Halpin knew had recently been victimized by a spate of burglaries, and continued their slow and apparently aimless course for several minutes before being stopped. The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely. *United States v. Magda*, 547 F.2d 756, 758 (2d Cir.1976), *cert. denied*, 434 U.S. 878, 88 S.Ct. 230, 54 L.Ed.2d 157 (1977); *see Brignoni-Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2581–82; *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976). Considering the rash of burglaries in this location, we believe that Halpin's observations were sufficient to raise a reasonable suspicion in the mind of an experienced police officer that the car or its occupants were involved, or about to become involved, in criminal activity. *See United States v. Holland*, 510 F.2d 453, 456 (9th Cir.), *cert. denied*, 422 U.S. 1010, 95 S.Ct. 2634, 45 L.Ed.2d 674 (1975) (" 'We cannot say that the circumstances of a car making inordinately slow progress along a street in the small hours of the morning could not reasonably have aroused the suspicions of a local officer alert to the unusual within his beat, and lead him to investigate.' ") (quoting *Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir.1966)); *Carpenter v. Sigler*, 419 F.2d 169 (8th Cir.1969) (stop of car traveling slowly in early morning through town which had recently suffered a series of burglaries found reasonable under *Terry*).

Nor are we shaken in this conviction by defendants' labored attempts to point out that all of defendants' actions could also be interpreted as manifestations of wholly innocent behavior. As other courts confronted with similar situations have frequently noted, "[i]t must be rare indeed that an officer observes behavior consistent *only* with guilt and incapable of innocent interpretation." *United States v. Price*, 599 F.2d 494, 502 (2d Cir.1979); *accord United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir.1983); *United States v. Black*, 675 F.2d 129, 137 (7th Cir.1982), *cert. denied*, 460

U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *United States v. Viegas*, 639 F.2d 42, 45 (1st Cir.), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). "It is for that reason that the applicable standard in determining the propriety of a *Terry* stop is not whether the defendant's acts can be construed as innocent through the exercise of exegetical speculation, but rather whether they give rise to an articulable, reasonable suspicion of criminal activity." *Black*, 675 F.2d at 137.

Finally, in determining whether the investigatory stop was legal, we examine its relative intrusiveness. *See Terry*, 392 U.S. at 18 n. 15, 88 S.Ct. at 1878 n. 15; *United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980) (Powell, J., concurring). There is no suggestion that the officers in this case attempted to harass or to intimidate the defendants. When stopped, the defendants' car was traveling at a very slow speed, and the occupants of the vehicle were asked only for identification. The initial stop involved no public embarrassment and no physical contact. This encounter was thus but a minor intrusion on the defendants' personal security; it was reasonably related to the observations which had caused Halpin to become suspicious, and it did not exceed the extent of inquiry reasonably justified by those suspicions. *See United States v. Wylie*, 569 F.2d 62, 70–71 (D.C. Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542; *Holland*, 510 F.2d at 456.

We therefore conclude that this stop was an entirely proper "intermediate response" of the type approved in *Terry*:

> In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (citations omitted). The trial court was correct in concluding that the stop in this case was a valid investigatory stop.

■ The next question is whether the search of the car's passenger compartment was valid. Although such a search cannot be justified by the mere "reasonable suspicion" that validates an investigatory stop, in this case the information available to the police after stopping the car quickly matured from the initial "reasonable suspicion" into the requisite "probable cause" to believe that the automobile contained contraband. In the course of the valid investigatory stop, Halpin learned that neither defendant could produce any identification or indicia of ownership of the automobile. In plain view from outside the car,[3] Halpin saw a screwdriver and pliers on the rear floor and maps and a flashlight on the front seat of the car. Recognizing that these instruments could be used in a burglary, Halpin asked the defendants what they were doing—only to receive patently unsatisfactory answers. The continual furtive glances between the defendants, their stilted speech patterns, and the apparent attempts of Rickus to leave the scene further aroused the officers' suspicions. Finally, after sighting a bulge in Nazarok's

---

**3.** Contrary to defendant Rickus's suggestion, the use of a flashlight to aid the officer's vision did not transform the observations justified under the "plain view doctrine" into an illegal search. *See United States v. Ocampo*, 650 F.2d 421, 427 (2d Cir.1981); *United States v. Arredondo-Hernandez*, 574 F.2d 1312, 1315 (5th Cir.1978); *United States v. Pugh*, 566 F.2d 626, 627 n. 2 (8th Cir.1977), *cert. denied*, 435 U.S. 1010, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978).

jacket pocket and a portion of a bullet-proof vest protruding above the jacket, the officers discovered that both defendants were wearing full upper-body bullet-proof vests.

■ These circumstances gave the officers probable cause to search the car under the automobile exception to the warrant requirement established by *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The information available to them supplied probable cause for the officers to conclude that a burglary had been or was about to be committed and that a search of the car would reveal evidence of the crime. No more was required. Probable cause deals with probabilities, not certainties. The facts known to the officers must be judged in accordance with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). More recently, the Supreme Court defined the process of determining the existence of probable cause as "a practical, common sense decision whether, given all the circumstances ..., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2348, 76 L.Ed.2d 527 (1983). The objective facts of this case certainly justified the officers in concluding that there was a fair probability that evidence of a burglary would be found in the car. The district court was correct in holding that the search of the passenger compartment was legal.

The district court held, however, that the search of the locked trunk of the car, as opposed to the passenger compartment, was unlawful even if judged by the federal law, because "probable cause to believe the passenger area of an automobile contains burglar tools does not alone justify a search of its trunk." We believe that this interpretation of federal law, which requires independent cause to believe the trunk itself contains contraband before permitting a trunk search, is overly narrow, and inconsistent with recent decisions of the Supreme Court and this court. In *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the Supreme Court held that

> [i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search *of every part of the vehicle* and its contents that may conceal the object of the search. (Emphasis added).

456 U.S. at 825, 102 S.Ct. at 2172. In *United States v. Schecter*, 717 F.2d 864 (1983), we interpreted this language to mean that the police need have no more exact suspicions to search a trunk than are required to search the passenger compartment under the automobile exception, nor need they have independent reason to believe that the contraband for which they are searching is located specifically in the trunk. "If the state troopers in the case before us legally could have conducted a highway search of the auto under the automobile exception, they legally could have searched the passenger compartment and the trunk." *Id.* at 869. In this case, as the district court correctly concluded, the police were presented with ample evidence to give them probable cause to suspect that the automobile contained evidence of a crime. That being the case, and the trunk clearly being a "part of the vehicle" capable of concealing "the object of the search," *Ross*, 456 U.S. at 825, 102 S.Ct. at 2172, they were justified in searching the trunk.

We conclude that the initial investigatory stop, the search of the passenger compartment and the search of the trunk were all lawful. The evidence obtained from the trunk search should not have been suppressed. Accordingly, the district court's order granting defendants' motion to suppress all evidence obtained in the search of the trunk will be reversed.