UNITED STATES of America,

v.

Jeffrey L. MYERS, Peter D. Middleton, Defendants.

Crim. No. 87–0437.

United States District Court, D. New Jersey.

Oct. 3, 1988.

---

Office of the U.S. Atty. by Robert Farkas, Asst. U.S. Atty., Trenton, N.J., for U.S.

Office of the Federal Public Defender by John J. Hughes, Asst. Federal Public Defender, Camden, N.J., for defendant Myers.

Richard S. Lehrich, Westfield, N.J., for defendant Middleton.

## OPINION

BROTMAN, District Judge:

### I. INTRODUCTION

Presently before the court are the motions of defendants Peter D. Middleton and Jeffrey L. Myers to suppress all evidence seized from them by the New Jersey State Police on November 3, 1987, prior to and pursuant to their arrest. In addition, defendant Middleton moves to sever Count 3 of his indictment from Counts 1 and 2. A hearing has been conducted on this matter, and, for the reasons discussed below, this

court finds itself compelled to grant defendants' motions in their entirety.

## II. FACTS AND PROCEDURE

On November 3, 1987 at approximately 8:30 p.m., defendants were stopped for speeding by two New Jersey State Troopers on Route 539 in Plumstead, New Jersey.[1] At the time, the defendants were traveling in a Volkswagen pickup truck owned and driven by Middleton. As soon as the defendants noticed the flashing lights of the police cruiser behind them, they pulled to the side of the road and stopped. As the Troopers approached the pickup on foot, they both claim to have seen in the bed of the truck at least two cardboard boxes stamped "Supply and Service Division ... WHSE J2535, Bay 1 Knox Street, Fort Bragg, North Carolina 23307" and containing what appeared to be several new suitcases. How the Troopers were able to observe these boxes is a matter of contentious debate between the parties. Defendants claim that the entire bed of the pickup, which was filled with cardboard shipping boxes, was covered by a securely fastened tarpaulin. Defendant Middleton claims to have seen in his side-view mirror one of the Troopers use his flashlight to lift the tarp and peer underneath. The Troopers, on the other hand, assert that the front driver's-side corner of the bed was exposed, with the boxes in plain view.[2]

Upon request, Middleton provided a valid drivers license and vehicle registration, but when the Troopers—who were aware that three military installations (none of them Fort Bragg, however) were in the immediate vicinity—asked defendants about the boxes, they apparently gave evasive and inconsistent answers. In addition, defendants were "extraordinarily nervous," were acting "very suspicious" and defendant Myers, who was sitting in the passenger seat, continually glanced toward the rear of the truck. As a result, the Trooper standing by the passenger side door, ostensibly fearing for his safety and that of his partner, reached back and lifted part of the tarpaulin to ensure that neither a confederate nor a weapon was hidden underneath. It was at this point that a box containing empty pistol holsters was discovered. Defendants were then asked to exit the vehicle, and after being frisked they were questioned about the origins of the holsters and the contents of the rest of the boxes. Defendant Myers claimed that the goods were his and that he had gotten them from a friend. When pressed further, however, neither defendant provided explanations that satisfied the Troopers. One of the Troopers then searched the cab of the truck and found a large pair of bolt-cutters and a second valid drivers license for Middleton from a different state. When defendants could not provide satisfactory explanations for the existence of these items either, they were placed under arrest and charged with obstruction pursuant to N.J. Stat.Ann. § 2C:29–1.

Following the arrest, the tarpaulin was fully removed from the bed of the truck, revealing at least twenty boxes filled with assorted military items. Defendants and their truck were taken to the Fort Dix police barracks where a full inventory search of the truck was conducted. Among the items seized were holsters, assault vests, assault belts and canteens. Defendants were released on bail on the obstruction charge the next day, but the truck and its contents were retained. Upon further investigation the police determined that the military items in the truck had been stolen from the Lakehurst Naval Air Center and it was at this point that the defendants were charged with theft of government property.

One week later, when Middleton voluntarily surrendered himself upon hearing of

---

1. The defendants' vehicle was allegedly traveling at sixty miles per hour in a fifty-mile-per-hour zone. In addition, one of the vehicle's tail lights was inoperative. Neither defendant challenges these allegations and this court will accept them as true for the purposes of this opinion.

2. The actual position of the tarp is not important to the court's decision but we will accept the Troopers' version of the initial discovery as correct.

the charges against him, he allegedly assaulted Special Agent James Maxwell. As a result, he was charged with assault of a federal officer and it is that charge which Middleton seeks to sever from the rest of his indictment.

## III. DISCUSSION

### A. *Myers' Standing*

 The government asserts that defendant Myers has no standing to challenge the constitutionality of the search of the truck. This court thinks otherwise. In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court held that a passenger in an automobile does not have standing to challenge the search unless he claims a "property [or] a possessory interest in the automobile, [or] an interest in the property seized." *Rakas*, 439 U.S. at 148, 99 S.Ct. at 433. According to the testimony of the Troopers, Myers claimed that the goods in the truck were his and that he had obtained them from a friend. This declaration of a possessory interest in the items seized is enough to give Myers standing to challenge the search.[3]

### B. *The "Stop"*

The government concedes that the burden is on them to establish the reasonableness of a warrantless search, *United States v. Williams*, 604 F.2d 1102 (8th Cir. 1979), by a preponderance of the evidence, *United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974). They go on to argue that the initial stop and "unintrusive" questioning were justified under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and from there the information the Troopers gathered " 'quickly matured ... into the requisite probable cause to believe that the automobile contained contraband.' " Government's Brief at 8 (quoting *United States v. Rickus*, 737 F.2d 360, 366 (3d Cir.1984)). Once probable cause existed, the government continues, the automobile exception to the warrant requirement es-

tablished by *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), permitted the search of the pickup. While the government's legal argument has merit, it does not mesh with the facts of this case as they developed at the suppression hearing.

First, of course, it is uncontroverted that the initial stop of the truck—for speeding and for a defective tail light—was lawful. The issue thus becomes whether it was lawful to effectively "stop" the defendants again, by keeping them on the scene for purposes not related to the traffic infractions.

 The stop and detention of a person or of a moving vehicle—even for a brief period—is considered a "seizure" within the meaning of the fourth amendment. *United States v. Montgomery*, 561 F.2d 875, 878 (D.C.Cir.1977) (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 878–82, 95 S.Ct. 2574, 2578–81, 45 L.Ed.2d 607 (1975)); *cf. Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968); *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1978). While a fourth amendment seizure normally requires a warrant, or at least probable cause, the Supreme Court has held on countless occasions that the stop of a person or vehicle may be accomplished in certain circumstances without a warrant and even without probable cause to believe the person is or has been engaged in criminal activity. As the Court stated in *Brown v. Texas:*

> We have recognized that in some circumstances an officer may detain a suspect briefly for questioning although he does not have "probable cause" to believe that the suspect is involved in criminal activity, as is required for a traditional arrest. *United States v. Brignoni–Ponce*, [422 U.S.] at 880–881 [95 S.Ct. at 2579–80]. *See Terry v. Ohio*, [392 U.S.] at 25–26 [88 S.Ct. at 1882–83]. However, we have required the officers to have a *reasonable suspicion*, based on objective facts,

3. The Court's holding as to Myers' standing applies also to the bolt-cutters found in the cab of

the truck as they are the "fruits" of the illegal search of the bed of the pickup.

that the individual is involved in criminal activity.

*Brown v. Texas,* 443 U.S. at 51, 99 S.Ct. at 2640 (emphasis added) (citations omitted). The requisite reasonable suspicion must be objectively gauged. In *Brown,* for example, the Court held that two men seen walking away from each other in an alley in an area with a high incidence of drug traffic did not objectively present the level of "reasonable suspicion" necessary to allow a stop and brief questioning of one of the men. In *United States v. Montgomery,* the D.C. Circuit came to the same conclusion, based on the fact that the police had observed the defendant driving through a mostly residential area at about 6:00 p.m. on a Friday evening. A few minutes after their initial sighting, the officers again saw defendant in the same general area, and when they followed him he appeared to be watching them in his rear-view mirror. The court held:

> This may have been reason for an officer to become suspicious enough to keep an eye on defendant. But it can hardly be deemed to be an objective indicator of reasonable suspicion of criminal conduct.

561 F.2d at 879.

The government relies heavily on the Third Circuit's decision in *United States v. Rickus,* 737 F.2d 360 (3d Cir.1984), to defend the detention of defendants in this case. In *Rickus,* the police officer observed the defendants' car at 3:30 a.m. driving past the closed stores of a deserted business district at twenty miles below the posted speed limit. The officer then followed the car as it turned into a residential area that had recently been plagued by a dozen unsolved nighttime burglaries. The officer followed the car for several minutes as it continued to travel extremely slowly, at one point stopping momentarily in front of a residence. Finally, the officer stopped the car. The Court, speaking through Judge Hunter, held that "this stop was an entirely proper 'intermediate response' of the type approved in *Terry.*" *Id.* at 366.

■ In determining where the instant case falls along this "reasonable suspicion" spectrum, this court will accept the Troopers' version of the facts; specifically that at least two boxes with the apparent military address were in plain view as they approached the truck.[4] Given the fact that the boxes were stamped with what appeared to be the address of a military base, and given the proximity of three military bases to where defendants were stopped, this court finds that the Troopers had the requisite "reasonable suspicion" to transfer the stop for speeding into a *Terry* investigative stop. This finding, however, far from ends the inquiry, as the government must demonstrate something more than this "reasonable suspicion" of criminal activity to justify the subsequent search of the truck, a burden it does not meet.

### C. *The Search*

■ It is clear that once the box containing the pistol holsters was discovered in the bed of the truck, the Troopers had probable cause to believe that the vehicle contained the fruits of a crime and could search the rest of the truck pursuant to the automobile exception to the warrant requirement as developed by the Supreme Court in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). However, this court finds that the Troopers did not have the requisite probable cause required by *Carroll* before the holsters were recovered and thus could not rely on the automobile exception to search for them. The testimony of the Troopers demonstrates that immediately prior to the lifting of the tarp and the discovery of the holsters, the Troopers knew the following: two boxes with military addresses and containing luggage were in the bed of the truck; other boxes were also apparently in the bed, but covered by a tarp; the defendants were acting "extraordinarily nervous" and were

---

**4.** We note that if, indeed, the boxes had been fully covered by the tarpaulin, and the police officer had lifted it up in order to look underneath, that search would have been patently unconstitutional, even on a *"Terry* frisk" rationale. At the time the Troopers first approached the truck, there were simply no objective facts to indicate that defendants were guilty of anything more than traffic violations.

evasive and inconsistent in their answers to questions; and defendant Myers kept glancing towards the rear of the truck. The court finds the following facts to be relevant as well: the defendants were only driving 10 miles per hour over the speed limit;[5] they stopped as soon as they were signaled to by the police; the driver produced a valid license and registration on request; while the Troopers noted that these defendants seemed more nervous than normal, they also acknowledged that all drivers are nervous when stopped by the police; a private citizen has no obligation to give non-evasive or logically consistent answers to a police officer;[6] none of the military bases in the area had reported any thefts to the police and the Troopers did not first try to ascertain if any thefts had indeed taken place;[7] and there are just too many innocent explanations for why the defendants were in possession of two boxes bearing military addresses. In light of the above-enumerated factors, this court finds that the Troopers did not have the requisite probable cause to search beneath the tarpaulin in the back of the truck.

■ However, the government claims in its brief, and one of the Troopers testified at the hearing, that he feared for his safety and thus lifted the tarp to ensure that a confederate or a weapon was not hidden underneath. This argument, while legally sound, also does not fit the facts of this case.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court recognized the need to allow police officers who have made investigatory stops of individuals to protect themselves. The Court held that when the officer has a reasonable belief

that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

392 U.S. at 24, 88 S.Ct. at 1881. This "frisk" rationale has been extended by the Court to cover individuals seated in a car whom the officer reasonably believes to be armed, *see Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), and to those areas in the passenger compartment of an automobile where a weapon could be hidden when the officer reasonably believes that an occupant poses a danger. *See Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1982). While this court recognizes the "protective sweep" doctrine expressed in these decisions, it cannot extend it to cover the Troopers' actions in this situation.

First, the operative phrase in all the above cases is "reasonably believes to be armed." There is absolutely no evidence in the record before this court to demonstrate that the Troopers could have had a reasonable belief—before the holsters were found—that either of the defendants were armed. Indeed, most of the defendants' actions were more consistent with those of disgruntled motorists than of armed criminals. The court is sympathetic to the dangers confronting police officers as they deal with the unknown, but it is not clear how these defendants posed any more of a danger to the Troopers than any other motorist stopped for a traffic violation. The cases cited above are all distinguishable in that they involved officers who had reliable

---

5. The court does not condone even slight speeding, but recognizes the fact that such action is more indicative of "normal" rather than "suspicious" driving behavior.

6. As discussed later in this opinion, this is true even under the New Jersey obstruction statute relied on by the Troopers to take the defendants into custody.

7. The government claimed both in its brief and at the suppression hearing that, because of "the

lateness of the hour," Government's Brief at 2, attempts to contact the Fort Dix Military Police were unsuccessful. This court finds it highly dubious—and a little worrisome—that those in charge of security at a major military base were unavailable at 8:30 in the evening. Indeed, the government's assertion is called further into question by the Troopers themselves, who testified that they did not try to contact the military police while still at the scene of the stop.

information that the suspect was armed, *see Adams*, 407 U.S. 143, 92 S.Ct. 1921, or who had already observed a weapon within the suspect's reach. *See Long*, 463 U.S. 1032, 103 S.Ct. 3469.

Second, it seems clear from the record that the Trooper's search of the truck bed for a weapon or a confederate was simply a pretext for a search for evidence of some crime. The testimony of the Troopers themselves reveals that defendants were seated in the truck with one officer standing behind each door, near the front of the truck bed. In addition, one of the Troopers testified that the rear window of the cab was made of solid glass. Therefore, it seems physically impossible to this court that either of the defendants could have reached out the side windows and past the Troopers, both of whom were armed, and into the truck bed for a weapon. If the Troopers were really concerned that either defendant might produce a weapon, the most logical place to search would have been the cab of the truck. This was not done, however, according to the Troopers' own testimony, until the defendants had exited the truck and were sitting by the side of the road. Even more telling is the fact that, once the Trooper did look under the tarp, he only examined one corner of the truck bed, ending his "protective sweep" as soon as the holsters were discovered.

Because it was the discovery of the holsters that led the police to search the cab of the pickup and later to search the entire truck bed, all evidence discovered must be suppressed as the fruit of an illegal search. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1962).

The court recognizes that its holding means that there are certain cases where the police may have a "reasonable suspicion" of criminal activity that does not rise to the level of probable cause and, thus, they may have to release suspects who, it is later discovered, were carrying the fruits or instrumentalities of a crime. This does not trouble the court however, as such a result is necessary to ensure that some of our more precious freedoms are not trampled upon. In addition, we note that the Troopers could have taken the simple step of releasing the defendants and then following them while they attempted to contact the nearby military bases for information regarding the two boxes they had seen in plain view. No such attempt was made.

### D. *The Arrest*

 This court also feels compelled to comment on the legality of the arrest of the defendants for obstruction under N.J. Stat.Ann. § 2C:29–1. The government conceded in its brief that the arrest may not be "technically sustainable" and this court could not agree more. The statute states in pertinent part:

> a. A person commits an offense if he purposely obstructs, impairs or perverts the administration of law ... by means of intimidation, force, violence or *physical interference or obstacle*, or by means of any independently unlawful act.

N.J.Stat.Ann. § 2C:29–1 (emphasis added). It is clear from the plain language of the statute that it in no way applies to the defendants' actions in this case. Indeed, any statute that did proscribe "inconsistent" and "evasive" answers would run squarely up against the fifth amendment to the United States Constitution.

Curiously, counsel for the government, after reciting the statute to the court, tried to fit the defendants' actions under the category of "obstacle." However, a careful look at the structure of the statute and a quick nod to *Strunk and White* reveals that the "obstacle" must be "physical," not simply verbal. This court finds, therefore, that defendants' arrest was purely pretextual; effectuated for the sole purpose of seizing their truck and its contents pending further investigation.

### E. *The Severance*

 Rule 8(a) of the Federal Rules of Criminal Procedure permit the joinder of certain offenses where they are based on the "same act or transaction." Despite that fact that the assault allegedly oc-

curred when Middleton surrendered to face the charges contained in Counts 1 and 2 of the indictment, the assault is clearly not based on the same "act or transaction" as the theft. Neither requires proving elements of the other and, in fact, they are based on entirely different sets of facts. Therefore, Defendant Middleton's motion for severance of Count 3 from Counts 1 and 2 of the indictment is granted.

An appropriate order will be entered.

This matter having been brought before the court on the motion of defendants Peter D. Middleton and Jeffrey L. Myers for an order suppressing all evidence seized from them by the New Jersey State Police on November 3, 1987 and on the motion of defendant Peter D. Middleton to sever Count 3 from Counts 1 and 2 of his indictment; and

The court having conducted a hearing on these motions; and

For the reasons set forth in the court's opinion filed this date;

IT IS on this 23 day of September, 1988, hereby ORDERED that:

(1) Defendants' motion to suppress all evidence seized from them on November 3, 1987 by the New Jersey State Police is GRANTED;

(2) Defendant Middleton's motion to sever Count 3 from Counts 1 and 2 of his indictment is GRANTED.