**UNITED STATES OF AMERICA and GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**ROLAND JONES, Defendant**

Criminal No. 93-121

District Court of the Virgin Islands

Div. of St. Thomas and St. John

May 13, 1994

MOORE, *Chief Judge*

## MEMORANDUM

THIS MATTER is before the Court on defendant's objections to the Proposed Findings of Fact and Recommendations of the Magistrate Judge that the District Court uphold the arrest as lawful, deny the defendant's motion to suppress all items seized from the defendant on June 1, 1993, by the Virgin Islands Police Department,

and deny the motion to suppress the identification of the defendant. The District Court, after an independent review of the transcript of the hearing, the Magistrates Proposed Findings of Fact and Recommendations, the relevant case law, the defendant's objections and the government's response, has made a de novo determination that the seizure of the .357 magnum revolver and the fully automatic machine gun, as well as the identification of the defendant by the victim, did not violate the defendant's Constitutional rights. The Court's de novo determination includes the following findings of fact.

## FACTS

The defendant is charged as follows: Felon in Possession of a Firearm, Robbery First Degree, Assault First Degree and Possession of a Dangerous Weapon During The Commission of a Crime of Violence.

On or about the evening of May 31, 1993 and, apparently, into the early hours of June 1, 1993, police officers Kendelth Wharton ("Officer Wharton"), Kent Hodge ("Officer Hodge") and Ana Jimenez ("Officer Jimenez"), were on patrol in an unmarked rental car on Crystal Gade. They were in plain clothes in an area where there had been a series of robberies, auto thefts and grand larcenies. As they were driving along, they saw an individual by the name of Mr. Petersen, alias "Ortega," walking across the street in a heavy fatigue jacket. The officers testified that Petersen aroused their suspicion because: (1) it was a hot night, and to be wearing such a jacket was unusual, (2) the jacket also could easily conceal a gun, (3) Petersen was suspiciously and furtively glancing from side to side and (4) he was known to these officers for his criminal activities, as well as his association with Sebo Smalls, known to the authorities as a "drug lord." Petersen's previous encounters with the law include robberies, grand larcenies and driving stolen vehicles.

The officers observed Petersen approach and begin to get into the front passenger door of a Nissan Sentra that was parked at the intersection of Nye Gade and Crystal Gade, outside the Etty II hair salon. While the police officers were getting out of the vehicle, Officer Wharton asked "what are you guys doing in this area" and Petersen responded that he just came from Crazy Cow. Officers Jimenez and Wharton testified that they had their weapons drawn for their safety, since they were in an area that was not well lit, in

the early morning hours, about half past one o'clock, in the morning (1:30 a.m.).

While the officers could not see clearly into the rear of the vehicle that Petersen was about to enter, they could make out silhouettes of three individuals in the car. The occupants, defendant included, were ordered out of the vehicle. The driver and a minor, who sat in the back along with the defendant, finally got out after having been told several times to get out of the car. The occupants, including the defendant, were then patted-down and six live 9 millimeter rounds were found on Petersen and six more live 9 millimeter rounds were found on the minor. All the officers were being informed of these findings as they occurred. No weapons were found on any of the four individuals. Next, Officer Hodge looked into the vehicle from the driver's side, which had been left open, and saw a .357 magnum revolver, with a dark colored handle, on the back seat, next to the area where the defendant had been sitting.

All four individuals were then handcuffed, and a full search of the vehicle's interior was conducted producing a fully automatic machine gun from under the driver's seat. The four occupants of the vehicle were then placed under arrest and transported to Callwood Command (Traffic Bureau). Officer Wharton followed in the Nissan. Wharton remembers seeing the defendant in a chair at the back of the station, in handcuffs. The driver and Petersen were in the same area, and the juvenile was in the roll-call room.

Officer Wharton stated that as he left the station to go back to check on the Nissan, he heard an unnamed and unidentified gentleman say "there is the guy." The officer did not know who was being referred to as "the guy" and the gentleman making the comment was not identified. There was certainly no evidence produced that the gentleman was the Mr. Thompson, who later identified the defendant at the Investigation Bureau in Nisky Center.

Mr. Thompson testified that on the night of May 31, 1993, at about nine o'clock in the evening (9:00 p.m.) he was at home, taking clothes off the clothes line for his mother. A blue Nissan vehicle passed his house with three people in it, and, then, the defendant "came back" and robbed him of three hundred fifty dollars. Thompson also stated that the person who robbed him had a .357 magnum chrome revolver, with a brown handle, and that the robbery took about ten minutes. Mr. Thompson related that he has good vision and that the robber was not wearing a mask so he was

able to see his face clearly since there was good light coming from the porch.

Mr. Thompson called the police and reported the robbery. When he got tired of waiting for the police to arrive, he went that same evening to the traffic bureau at Callwood Command to make a report. The next morning, June 1, 1993, Thompson went to the Investigation Bureau at Nisky Center to make another report, since he had heard nothing further from the police. According to Thompson, it was about eight o'clock (8:00 a.m.) or nine o'clock (9:00 a.m.) when he arrived at the Investigation Bureau, although Officer Cordell Rhymer ("Officer Rhymer"), who was assisting at the Investigation Bureau, remembers the time was more like twelve o'clock noon (12:00 p.m.).

When Thompson arrived at Investigations Bureau, he knocked on the door, and when the door was opened, he saw the defendant. He recognized him as the robber and, immediately, told the police. As Officer Rhymer recalls, he was attempting to get a statement from the defendant, who had been brought to the bureau to be processed, when all of a sudden, the defendant put his head down on the desk. Because he did not know why the defendant had slumped on the desk, Officer Rhymer asked the defendant if he was high. Then, Officer Rhymer heard a voice exclaiming, "that is the one who robbed me with a big chrome gun!"

Mr. Thompson told Officer Rhymer that he was one hundred percent sure about the identification even though he had never seen the defendant before the robbery. Thompson explained that the police attempted to have him look through a mug book, but he did not look through the book, since the robber was right there in the room.

## DISCUSSION

### I. Whether the initial stop, frisk and seizure violated the defendant's constitutional right to be free from unreasonable search and seizure

The right of the people to be secure in their persons, house, papers and effects, against unreasonable searches and seizures, shall not be violated . . . . U.S. Const. amend. IV. Although an individual is entitled to be free from unreasonable governmental intrusion, what the Constitution forbids is not all searches and seizures, but

unreasonable searches and seizures. Terry v. Ohio, 392 U.S. 1, 9 (1967).

Whenever the police stop an individual and restrain his freedom to walk away, a seizure has occurred. Id. at 16. Hence, the Fourth Amendment does apply, even where the officers stop short of a technical arrest or a full blown search. Id. at 19. However, an investigatory stop, short of an arrest, is valid if based upon a reasonable suspicion that criminal activity is afoot or that a crime has been committed. See Terry 392 U.S. at 30; and U.S. v. Hensley, 469 U.S. 221, 227–229 (1984). Reasonable suspicion is to be based upon specific and articulable facts, which, taken together with reasonable inferences, warrant that intrusion. U.S. v. Rickus, 737 F.2d 360, 365 (3d Cir. 1984). The Court must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers. Id. Further, the facts must be judged against an objective standard: Would the facts available to the officer at the moment of the search or seizure justify a man of reasonable caution in the belief that the action taken was appropriate. Terry, 392 U.S. at 21–22.

In light of the foregoing legal precepts, this Court finds that the initial stop of the defendant by the police officers was constitutional. Notably the officers saw a man looking around in a suspicious fashion on a hot night wearing a heavy coat in a high crime area, which gave them the right to question him as he was getting into the vehicle. In addition, the officers knew him from prior criminal activities, particularly his association with a known "drug lord," which justified their added precaution of getting out of their vehicle with their guns drawn. The officers were in plain clothes, which heightened their need to take extra precautions to avoid being mistaken for someone who may have a reason to retaliate against Petersen, since they would not be readily identified as police officers without their uniforms.

■ In light of all of these circumstances it was reasonable to frisk Petersen and to require the other three to get out of the vehicle and be patted down. A police officer may stop individuals reasonably suspected of criminal activity and frisk for weapons if he reasonably believes that the individuals pose a threat to his safety or

the safety of others. Terry, 392 U.S. at 21–22, 28.[1] The Court finds that given the officer's knowledge of Petersen's criminal activity it was reasonable for the police to suspect that he posed a danger to them. In addition the Court finds that the three occupants of the vehicle, could have posed a danger to the police, since the officers could not see them clearly from outside the vehicle. Passengers in motor vehicles have no Fourth Amendment right not to be ordered from their vehicles once a proper stop is made. Rakas v. Illinois, 439 U.S. 128, 155, n.4; See also Pennsylvania v. Mimms, 434 U.S. 106 (1977). A security pat-down was conducted which revealed ammunition on the person about to get into the car, Petersen, and one of the occupants, the minor.[2] Once the ammunition was found on the juvenile, the officers had probable cause to search the car, even if an officer had not seen a gun in the car by looking inside the open driver's side door. Having seen the .357 magnum on the seat, in plain view, the officers clearly had probable cause to continue the search for a weapon to match the ammunition found on the two individuals.[3]

While each of these actions, by itself, may not have satisfied the reasonable suspicion criteria, together they suffice to establish a reasonable suspicion based on articulable facts. See U.S. v. Owens, 472 F.2d 780 (8th Cir. 1973) (defendant recognized, by police, as a "police character"); U.S. v. Wickizer, 465 F.2d 1154 (8th Cir. 1972)

---

[1] The Terry Court noted that the concern is more than the "governmental interest; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him ... American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.... In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves ... in situations where they may lack probable cause for an arrest." Id. at 23–24.

[2] There was no evidence that the officers went into the individuals' pockets during the pat down.

[3] The Fourth Amendment does not prohibit the warrantless seizure of evidence in plain view. Horton v. California, 496 U.S. 128. The item's incriminating character must be immediately apparent and the police officer must have a lawful right of access to the object itself. Id. at 136–37. The officer had a legal and legitimate right to be in that position, since he was only making a check of the vehicle for his safety. The .357 Magnum revolver was in plain view and its incriminating character was immediately apparent, accordingly, the seizure of the weapons was legal.

(defendant recognized as having a prior record); U.S. Ex Rel Richardson v. Rundle, 461 F.2d 860 (3rd Cir. 1972) (defendant observed in high crime area), cert. denied, 410 U.S. 911 (1973); Rickus, 737 F.2d at 365 ("The reputation of an area for criminal activity is an articulable fact upon which police officers may legitimately rely"). Based on the objective standard of Terry, the officers were justified in believing their actions were correct.

## II. Whether the identification of the defendant was unduly suggestive and conducive to irreparable misidentification.

Suggestive confrontations are disfavored because "they increase the likelihood of misidentification . . . ." Neil v. Biggers, 409 U.S. 188, 198 (1972). "The admission of evidence of a show up without more does not violate due process." Id. *It is the likelihood of misidentification* that violates a defendant's right to due process. Id. (emphasis added). Whether a violation of due process of law in the conduct of a confrontation occurred depends on the totality of the circumstances surrounding it. Stovall v. Denno, 388 U.S. 293, 302 (1967).

 Here we do not need to reach the question of suggestivity and reliability of the identification because the identification of the defendant was not initiated by any suggestions on the part of law enforcement officers. Biggers, 409 U.S. at 200. In fact, Mr. Thompson did not know that the defendant was at the Investigation Bureau, and Mr. Thompson was not there at the request of the police. The record is devoid of any evidence that the police put Mr. Thompson up to this or set it up so that he would encounter the defendant. The officers who had arrested the defendant the night before did not even know that Mr. Thompson had been robbed. The encounter between Mr. Thompson and the defendant was a chance encounter, and the identification of the defendant was spontaneous. Based on these circumstances, it cannot be said that the confrontation was suggestive, since it was not initiated by any actions on the part of the police officers.[4] Mr. Thompson's identi-

---

[4] See U.S. v. Boykins, 966 F.2d 1240 (8th Cir. 1992); Mock v. Rose, 472 F.2d 619 (6th Cir. 1972), cert. denied, 411 U.S. 971 (1973); U.S. v. Pollack, 427 F.2d 1169 (5th Cir. 1970); Harker v. Maryland, 800 F.2d 437 (4th Cir. 1986); U.S. v. Serna, 799 F.2d 842 (2d Cir. 1986), cert. denied sub norm. Cinnante v. United States, 481 U.S. 1013 (1987).

fication was very positive and there is no doubt about its reliability.[5]

The fact that Thompson believes he identified the defendant in the morning, while Officer Rhymer said it occurred at about twelve noon (12:00 p.m.), does not affect the validity of the identification. Any discrepancy in the time that the identification was made may go to credibility at trial however it has no bearing on the Court's determination that the confrontation was not suggestive. Regardless of the time of day, what is abundantly clear is that the identification was spontaneous, unequivocal and without prompting by the police officers.

## CONCLUSION

Based on the foregoing analysis, the Court holds that the seizure of the .357 magnum revolver, the fully automatic machine gun, and the identification of the defendant by the victim were not violative of the defendant's Constitutional rights. For the foregoing reasons, defendant's motion to suppress is DENIED. An appropriate order follows.

DATED this 13th day of May, 1994.

## ORDER

AND NOW, this 13th, day of May 1994, upon consideration of defendant's motion for summary judgment it is hereby

ORDERED that the defendant's motion to suppress all items seized in this matter is DENIED; and it is further

ORDERED that the defendant's motion to suppress the identification of him is DENIED; and it is further

ORDERED that this case is set for trial during the trial week of June 6th, 1994.

---

[5] Although there may appear to be a discrepancy about when and where Mr. Thompson identified the defendant the Court finds that there is no evidence that Officer Wharton said he saw Mr. Thompson and there is no evidence that the defendant was the person that the individual was referring to as "the guy." See supra p. 4