**UNITED STATES of America, Plaintiff,**

v.

**Yu KIKUMURA, Defendant.**

**Crim. No. 88–166.**

United States District Court,
D. New Jersey.

Oct. 21, 1988.

Samuel A. Alito, U.S. Atty. and John P. Lacey, Asst. U.S. Atty., Newark, N.J., for the Government.

William M. Kuntsler, and Ronald L. Kuby, New York City, for defendant.

## OPINION

LECHNER, District Judge.

### Introduction

On April 12, 1988, Defendant Yu Kikumura ("Kikumura") was detained by New Jersey State Trooper Robert Cieplensky ("Cieplensky") for careless driving. As a result of the ensuing exchange between Cieplensky and Kikumura, Cieplensky saw seven cylinders of gunpowder and shot on the backseat of Kikumura's car. Suspecting Kikumura may be armed, Cieplensky proceeded to pat down Kikumura. Cieplensky next searched the interior of Kikumura's vehicle. The objects of this suppression motion—evidence including a large bag of lead shot, seven gunpowder cannisters and three homemade bombs—were discovered.

Kikumura was indicted for unlawful interstate transportation of explosive devices in violation of 18 U.S.C. § 842(a)(3)(A), unlawful possession and transportation of firearms by an illegal alien in violation of 18 U.S.C. § 922(g)(5) and unlawful possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5845(a)(8). He now moves to suppress the evidence discovered in his car, arguing that it is the tainted fruit of an unconstitutional stop, search and seizure.

Because Cieplensky's initial stop of Kikumura was lawful and the subsequent pat down, search and arrest were conducted in accordance with fourth amendment principles, the evidence seized from his car will not be suppressed. For the reasons which follow, Kikumura's motion to suppress is denied.

During the suppression hearing, Kikumura selectively invoked his fifth amendment privilege against self-incrimination and refused to answer those questions posed to him which, he argued, raised a well-founded fear of foreign prosecution. Contending that such selective invocation is improper, the Government moves to strike Kikumura's testimony. Although Kikumura has not sustained his burden of proof regarding the fear of foreign prosecution, the Government was not unduly prejudiced by Kikumura's assertion of fifth amendment privilege; its motion to strike is denied.

### Facts

Of central importance in this case is the testimony of two individuals: Cieplensky and Kikumura. Their respective accounts of the April 12, 1988 meeting converge at many points and yet diverge sharply regarding the location of the bombs in Kiku-

mura's car and Cieplensky's professional conduct.

## I. *The Morning of April 12, 1988, as Established by a Preponderance of the Credible Evidence*

At approximately seven in the morning on Tuesday, April 12, 1988 Cieplensky entered the Vince Lombardi service area, located in his assigned territory, the western roadway of the New Jersey Turnpike. Transcript of Suppression Hearing at 11.[1] The Vince Lombardi service area consists of a large parking lot, a gas station, rest room facilities and a restaurant. During the week, the area is frequented by commuters,[2] although Cieplensky indicated a variety of individuals pass through on any given day. Cieplensky characterized the rest stop as a "high crime area."[3] Tr. at 13. In addition to traffic violations, other crimes including robberies, assaults, and weapons, narcotics and sex offenses have occurred there.

As he entered the rest area, Cieplensky saw Kikumura walking toward the restaurant at the end of the parking lot. Kikumura looked disheveled. Cieplensky stated: "Basically, my best way to describe it would be dirty, unkept [sic].... His hair was not combed. He had a growth of beard.... His pants appeared dirty. His shirt appeared wrinkled." Tr. at 21. After making eye contact with Cieplensky, Kikumura altered his course, and headed back toward the parking lanes. As Cieplensky proceeded in his troop car past the restaurant, Kikumura walked to his car parked in the second parking space in the fifth parking lane and momentarily leaned against its door.[4] Kikumura then began, in Cieplensky's words, "milling around ... walking in circles at a very slow pace. He would ... walk around the garbage can" and look around and inside of it. Tr. at 17.

Cieplensky next observed Kikumura bend down on one knee, look underneath the car he was leaning against and resume his trip toward the restaurant. While Cieplensky continued driving in his troop car, Kikumura was within his direct line of vision. As Cieplensky drove, Kikumura looked over his left shoulder and once again made eye contact with Cieplensky. Kikumura then turned away from the restaurant and walked back toward his car. Kikumura quickened his pace as Cieplensky patrolled the area for the second time. When Cieplensky was half way down driving lane one, Kikumura entered his car, backed the car into driving lane three and abruptly maneuvered across parking lanes five and six at what Cieplensky believed to

---

1. Hereinafter, all reference to this transcript will be signified by "Tr. at ___".

2. When asked by defense counsel to describe a "typical Monday morning traveller" generally found at the rest area during the week, Cieplensky responded:

   A gentlemen going to work, dressed cleanly and/or neatly with a direct purpose in mind, stopping at the service area to use the rest room facilities or to get a cup of coffee or some breakfast or to use the telephone or to service his vehicle.

   Tr. at 120.

3. Although Cieplensky personally has made only ten arrests at the Vince Lombardi rest stop within the last three years, it was not established during his cross-examination, or indeed during any other aspect of the hearing, that this characterization was either incorrect or an exaggeration.

4. Both Cieplensky and Kikumura used Government Exhibit One ("Gov't Ex. 1") in evidence to assist in describing the events of April 12, 1988. Gov't Ex. 1 is an overhead photograph of the area. The driving lanes are numbered one to four from right to left; the parking lanes are numbered one to six from right to left.

There is a dispute as to whether Kikumura was parked in lane five, space two as the Government claims, or in lane four, space three, as Kikumura claims. The substance of the dispute is significant because it directly impacts upon Kikumura's credibility. I find Cieplensky's version credible. When Kikumura first testified on the issue, he walked to Gov't Ex. 1 and pointed to and touched the parking space where he said he was parked. This testimony concurred with that of Cieplensky. Shortly thereafter, Kikumura changed his mind and identified a parking space in parking lane four as the location of his car. Kikumura also stated at this later point that his car was "backed into" this space. This also conflicts with Cieplensky who placed Kikumura's car in the other parking space nose first, thus indicating the car was driven into, not backed into, the parking space. Kikumura's change in testimony is plainly incredible.

be "a high rate of speed and in close proximity of other parked vehicles." Tr. at 22.[5]

Considering this to be a motor vehicle violation,[6] Cieplensky motioned Kikumura to pull over. Kikumura stopped his car, exited the vehicle and began walking towards the troop car. Cieplensky parked approximately fifteen feet behind him and met Kikumura at the left rear of his vehicle. After Cieplensky asked Kikumura for his driving credentials, Kikumura produced an international driver's license, a temporary registration certificate and a temporary insurance card, all issued in the name of Masatoshi Kishizono. As Kikumura searched through a carrying pouch for the documentation, Cieplensky noticed a bandage on his right wrist and index finger and fresh burn marks on the right side of his neck. Questioned by Cieplensky about his injuries, Kikumura explained that he had burned himself while cooking.[7] Cieplensky then engaged Kikumura in conversation, asking him a series of questions. Although Kikumura's account of this exchange differs somewhat from Cieplensky's, in substance both confirm that Kikumura told the trooper he practiced accupuncture in Japan (Cieplensky: "He advised me that he was like a doctor in Japan." Tr. at 26) and that Kikumura was coming from Pennsylvania and was on his way to New York.

As they were talking and standing next to Kikumura's car, Cieplensky had the opportunity to see the interior of the car. Cieplensky observed some bandages and medical supplies in the front passenger area and a large black bag on the right rear seat. Visible within the bag were seven open cardboard containers with the words "gunpowder" and "Hercules" printed on them as well as a canvas pouch labelled "shot" with BBs pouring out of it.[8] Cieplensky is familar with gunpowder and with the brand "Hercules" because he often watched his father and friends load their own shotgun shells with gunpowder, wadding and shot.

These observations aroused Cieplensky's suspicions. Fearful that because he had in his possession a quantity of gunpowder and shot inconsistent with personal use,[9] Kikumura was likely to be armed, Cieplensky conducted a pat search of Kikumura's person. After satisfying himself that Kikumura was unarmed, Cieplensky continued talking with him. Again viewing the car's interior from the outside, Cieplensky spotted a large cardboard box standing up behind the right front passenger seat. In that box, he saw three red cylindrical objects, one of which had some black tape across its bottom and two wires protruding from the tape.[10] Turning to Kikumura,

---

5. Specifically, Cieplensky stated that Kikumura was driving twenty-five to thirty miles per hour. Tr. at 24.

6. On cross-examination, Cieplensky testified that he issued Kikumura a ticket for careless driving in violation of N.J.S.A. § 39:4–97. Exhibit D–2.

7. These injuries are not significant by themselves; however, they are at the least curious when placed in context with the large quantity of gunpowder and lead shot Cieplensky saw in the car.

8. Cieplensky testified, "[i]n general, there was quite a bit of things in the car. I would describe it as ... a mess." Tr. at 28.

9. When asked whether the number of gunpowder containers he observed in Kikumura's vehicle was consistent with personal use, Cieplensky responded:

   A. I believe that due to the number of boxes, there was a large amount of gunpow-

der used and I do not believe that that was consistent with personal use.

   Q. Now, looking at, just as an example, how much would you use in one shotgun shell?

   A. It's measured by grains, I believe. It's a small amount. Less than an ounce, wayless than an ounce on a shell.

   Q. And do you know how much your father would use in say a season, hunting season?

   A. My father, during hunting season, used less than one pound of gunpowder.

Tr. at 32–33. Each of the seven gunpowder containers held one pound of gunpowder. The sack of shot was a twenty-five pound sack. Gov't Exs. 50AA, 50BB, 50CC and 50DD.

10. Cieplensky was questioned on cross-examination about this scenario.

   Q. And you would think, would you not, that anyone in [Kikumura's] position would have disguised (the explosives) or hidden them in some way, wouldn't you?

Cieplensky asked what was in the cardboard box. Kikumura replied, "Souvenirs. Go ahead, check it out." Tr. at 34. Cieplensky moved to the passenger side, opened the door and removed the cardboard box. Pulling out one of the cylindrical objects, Cieplensky saw green tape covering one end.[11] The object weighed about five pounds and seemed to be fashioned from a fire extinguisher with its nozzle detached.

At this point, Cieplensky concluded that Kikumura was in possession of bombs.[12] Cieplensky arrested Kikumura, handcuffed him, placed him in the rear of the troop car and read him his *Miranda*[13] warnings. Next he briefly searched the interior and trunk of the car for additional explosives. Finding nothing else of immediate consequence, Cieplensky again examined the bombs and placed them a distance away from the car. As he did this, Cieplensky observed Kikumura in the rear of the troop car making a harsh movement toward the right side of his body. Fearful that Kikumura might be reaching for a remote device to activate the bombs, Cieplensky pulled him from the troop car, placed him face down on the ground and conducted a more intensive search of his person.[14] No remote device was discovered.

Shortly thereafter, State Police Trooper Dennis Donovan arrived at the scene; Cieplensky apprised him of what had transpired. Cieplensky then radioed his station in Newark and requested that a detective be called to the rest area. State Police Detective Patrick Higgins arrived and took charge of the evidence. State Police Detective Drew Lieb, assigned to the arson unit bomb squad, was summoned; he proceeded to x-ray the cylinders and, with the help of a mechanical device, rendered the bombs safe for transportation. In the meantime, Kikumura was taken inside a service station office at the rest stop and again received *Miranda* warnings. Refusing to

---

A. I can't say that, sir. I've seen many funny things on the New Jersey Turnpike.
\* \* \* \* \* \*
Q. If you were Mr. Kikumura you would have certainly put (the explosives) in the trunk, wouldn't you?
A. If I was Mr. Kikumura, I certainly would not be making bombs, sir.
Tr. at 117–118.

11. To an extent, this testimony is at odds with an interview given by Cieplensky to Detective Fuentes of New Jersey State Police, Terrorism Task Force, within one or two hours after Kikumura's arrest. The interview was memorialized in a document marked Defendant's Ex. D–7 in evidence.

Ex. D–7 states:
TPR CIEPLENSKI then asked the subject about them, and was told that they were souvenirs, and that he (TPR) could go ahead and check.
At this time, TPR CIEPLENSKI opened the right rear passenger door, removed the box and lifted out one of the cylinders. He indicated that all three items were covered with tape at the top portion and each had two wires, also emanating from the top.
This inconsistency does not compel a finding that Cieplensky's testimony is incredible. Whether Cieplensky's recollection that he saw tape and wires on one of the red cylinders while he was outside of the car is correct or if his recollection results from the removal of one of the cylinders from the box, Cieplensky had consent from Kikumura to search the car, *see* pp. 560 to 61 *infra,* and, in any event, Cieplensky

had a reasonable, articulable basis to search for a weapon after viewing the gunpowder and shot. This reasonable, articulable suspicion ripened into probable cause to search after Cieplensky inspected the three bomb cylinders in close proximity to the seven gunpowder cannisters and bag of lead shot. *See* p. 562 *infra.*

12. Cieplensky testified that he had received training in the identification of explosive devices. During his course at the State Police Academy, he attended a seminar on the identification of bombs and procedures to follow when they are contacted. Additionally, as part of his in-service training in 1987, Cieplensky took another course in the identification of explosives.

13. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

14. In an attempt to explain this event, Kikumura testified that Cieplensky did not want him to observe the trooper's activity. Kikumura stated that while Cieplensky was conducting a search of his car,
A. I got his eye. He came running toward me, he pulled me out, he pressed my face to the ground, he asked me what I was doing. I said nothing.
He put me back to the car. He ordered me, he ordered me like this. Lie down in the back of the seat of the police car. So I couldn't see what he was doing thereafter.
Tr. at 257.

sign a waiver form, Kikumura requested counsel. He was then strip searched and transported to the police station.

### A Different Version of the Facts

Kikumura's version of what transpired on April 12, 1988 differs substantially from the above account. I do not find Kikumura's testimony credible. The major discrepancies between the testimony of Cieplensky and Kikumura are set forth in order to provide a complete record and to acknowledge Kikumura's testimony, but not to accept the validity of his account.

Contradicting Cieplensky's testimony that he was driving carelessly, Kikumura asserts that while at the rest stop he drove slowly, approximately five miles per hour.[15] Kikumura, however, offers no explanation for why Cieplensky pulled him over.[16]

In contrast to Cieplensky's placement of the gunpowder cannisters, shot and bombs in plain view, Kikumura testified that none of these items were in the car's passenger compartment. For example, Kikumura testified on direct examination as follows:

Q. Did you have those in the back seat of your car?

A. No, I didn't have them in the back seat.

Q. Did you have them in the passenger compartment of the car at all?

A. No, I didn't.

Q. Where were they located?

A. Way inside the trunk.

\* \* \* \* \* \*

Q. These were the items [the gunpowder cannisters, shot and bombs] that Trooper Cieplensky testified that he saw in plain view in the back seat of your car. Is that correct?

A. That's not true.

Q. Those were not located in the back seat of your car?

A. I didn't put them in the back seat.

\* \* \* \* \* \*

Q. So if someone had walked by your automobile while it was parked for 20 minutes and looked in the window, they would not have seen these items. Is that correct?

A. No, they couldn't.[17]

Tr. at 198–199.

Kikumura denied that he invited Cieplensky to "check out" the cylinders found in the back seat of his car.

Q. Did he at any point ever ask you your permission to search the car?

A. No, he didn't.

Q. Did you at any point ever tell him that I could search the car or tell him check it out?

A. No, I did not.

Tr. at 213. In fact, Kikumura testified that the cylinders were packed in a cardboard box enclosed within a blue suitcase which was in turn located in the trunk.[18] On

---

**15.** *See also* Tr. at 270–271:

Q. Mr. Kikumura, you were driving carefully when these items were in your trunk. Is that correct?

A. Yes, I was.

Q. You were not driving at excessive rates of speed. Is that correct?

A. No, I was not.

**16.** It is noted that when Kikumura was requested to pull over to the side of the road, he got out of his car before being asked to do so and began walking toward the troop car. During cross-examination, Kikumura acknowledged he had been stopped by a state trooper a few weeks earlier for a speeding violation. On this earlier occasion, Kikumura remained in his car while he spoke to the trooper. Kikumura's behavior at this point is consistent with one who would have preferred that Cieplensky not to focus on the interior of his automobile.

**17.** On cross-examination, Kikumura was questioned about his contention that the explosives were not in plain view.

Q. ... I'm asking you, it isn't your testimony, is it, that Trooper Cieplensky took, took Government exhibit 50DD out of the trunk and then brought it around to the back seat and planted it on the back seat is it?

\* \* \* \* \* \*

A. I think he did it.

Q. You think that's exactly what he did. Is that right?

\* \* \* \* \* \*

A. Yes. I think he did that.

Tr. at 256.

**18.** In support of Kikumura's version of the facts, the defense subpoenaed John Crowley ("Crowley"), an employee of the rest area gas station at the time of Kikumura's arrest. Crowley testified he saw Cieplensky looking into the

recross examination, the Assistant United States Attorney questioned Kikumura on this issue.

Q. Is it your testimony, sir, that Trooper Cieplensky, for no reason whatsoever, simply opened the blue suitcase, pulled out the box, ripped off the tape, opened the box and then pulled out a bomb and seeing that only then did he place you under arrest?

A. After he opened this for no reason, he arrested me.

Tr. at 272.

From the viewpoint of detection avoidance, it does appear unwise to transport explosives exposed in the interior of one's car. Yet it is often as a result of such lapses of common sense that crimes are detected. There appears to be a reasonable explanation for placing the bombs on the rear floor behind the front passenger seat. This placement also enables easy access to the explosives, not only permitting ease of removal without attracting much attention, but also providing the ability to monitor and control the bombs while the car is moving.[19] In addition, by positioning the bombs in the rear seating area, Kikumura was able to transport them more safely because of the greater protection afforded than if the bombs were transported in the trunk.[20]

The defense has pointed to no reason why Cieplensky's testimony should not be credited in full. Nothing was offered to suggest Cieplensky had prior experience with Kikumura, had a grudge against Kikumura or had ever met Kikumura before April 12, 1988. Nor did the defense suggest any reason or motive for Cieplensky to manufacture the motor vehicle stop or to move the bombs, gunpowder cannisters and shot from the trunk to the interior rear of the car.[21] Kikumura's rendition of the facts, on the other hand, is incredible. His testimony not only lacked credibility, but his responses to questions posed were often evasive.

Having considered the demeanor, tone of voice, manner of response, factual presentation by both Cieplensky and Kikumura, and possible bias of each witness while testifying,[22] I conclude that Cieplensky's

---

trunk of Kikumura's car while Kikumura stood on the passenger side of the car. He testified he also saw Kikumura "face down on the ground, cuffed." Tr. at 173. Kikumura suggests Crowley's account corroborates his assertion that the explosives were not in plain view and that Cieplensky searched the trunk first and only then arrested Kikumura. Defendant's Brief at 6.

It is not clear at what point Crowley observed Cieplensky and Kikumura. He did not witness Cieplensky remove anything from the trunk and cannot offer a definitive account as to what occurred. Crowley testified he was late for work that morning and was in a hurry. While Crowley's testimony is not fully consistent with Cieplensky's, it does not seriously undermine Cieplensky's credibility.

19. During cross-examination, Kikumura rejected the Government's suggestion that he positioned the explosives behind the driver's seat so that he could maintain control over them and minimize the risk of accidental detonation.

Q. Is it not a fact, sir, that these bombs, the bombs that you were carrying in your car behind—were behind the passenger seat in your car, because you wanted to have control over them and make sure that they didn't hit against something in the trunk of the car and explode. Isn't that right?

A. It was not true that they were in the back seat of the passenger seat, in the back seat, passenger seat. It is not true that you said it was in the back seat behind the passenger seat. They were all in the trunk.

Tr. at 267–268.

20. As Detective Lieb testified:

By having it in the rear itself, he has a better chance of cushioning it if there was an accident or something happened from the outside or the car was hit, pushed, or dented or something of that effect. That device would stay, the less chance of going off where it was than, let's say, in the trunk where somebody smacking into the rear of the trunk.

Tr. at 158–159.

21. The defense did imply that this was Cieplensky's biggest case and therefore he had a motive to move the evidence and testify as he did in order to sustain the search and seizure. However, the sensational aspects of this case were apparently not known to Cieplensky at the time of the stop and arrest. The "bigness aspect" seems to take form days and weeks after the morning of April 12, 1988, when the print and broadcast media began reporting and speculating on the international and radical aspects of the case.

22. Determinations of credibility are uniquely the province of the fact-finder. *Government of Virgin Islands v. Gereau*, 502 F.2d 914 (3d Cir. 1974); *United States v. Owens*, 472 F.2d 780,

account of the events of April 12, 1988 are credible; I reject Kikumura's account.

*Discussion*

### I. Government's Motion to Strike Kikumura's Testimony

■ During the suppression hearing, Kikumura refused to answer several questions posed to him by the Government. Although Kikumura testified at length during cross-examination about the events of April 12, he invoked the fifth amendment and refused to answer the following questions:

Q. Sir, did you carry into Amsterdam, Holland in May of 1986 in your luggage, an orange drink container which was later found to contain explosives?

Q. Sir, in your luggage which you carried into Holland in May of 1986, did your or did you not have six detonators in a Sanyo transistor radio?

Q. Sir, is it or is it not a fact that after Amsterdam authorities searched your luggage, that you claimed that a Sanyo radio and an orange drink container found in your luggage were given to you by some American woman in Athens, Greece prior to your arrival in Amsterdam?

Q. Did you use a passport in another person's name in order to gain entry into the United States?

Tr. at 222–223, 226. These questions related to Kikumura's 1986 arrest in Holland on explosives charges and the circumstances surrounding his possession of a fraudulent passport. Kikumura asserted that answers to these questions would place him at risk of prosecution in Japan.

Selective invocation of the fifth amendment is disfavored. The privilege against self-incrimination was not intended to shield a vulnerable witness from aggressive cross-examination. Cross-examination is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). Nevertheless, the fifth amendment may be invoked to protect a witness against giving testimony that would "furnish a link in the chain of evidence needed to prosecute" him for a crime, provided there is "a real and substantial risk, as distinguished from a mere possibility, that answers to questions might provide a link which would lead to incrimination of him." *In re Gilboe*, 699 F.2d 71, 75 (2d Cir.1983); *accord California v. Byers*, 402 U.S. 424, 431, 91 S.Ct. 1535, 1539, 29 L.Ed.2d 9 (1971); *In Re Grand Jury Subpoena of Flanagan*, 691 F.2d 116, 120 (2d Cir.1982).[23]

When warned that if he testified selectively his direct testimony may be stricken, Kikumura responded,

I am Japanese. I think there is a person from Japanese embassy. Depending on how I answer this question, there will be pressure of indictment from the Japanese police. For that reason I'm going to keep silent or refuse to answer the questions.

Tr. at 222. With regard to the questions about his encounter in Amsterdam, Kikumura briefly explained the basis of his silence.

A. At that time in the case of Amsterdam, I kept silence and this time I am going to keep silence also.

---

784–784 (8th Cir.1973); *Wilkin v. Sunbeam Corp.*, 466 F.2d 714, 717 (10th Cir.1972), *cert. denied*, 409 U.S. 1126, 93 S.Ct. 940, 35 L.Ed.2d 258 (1973).

**23.** In order to determine whether a real and substantial risk of foreign prosecution has been established, a number of factors must be considered, including:

(i) whether there is an existing or potential foreign prosecution of the defendant;

(ii) what foreign charges could be filed against him;

(iii) whether the foreign prosecution would be initiated or furthered by his testimony in the United States;

(iv) whether such charges would entitle the foreign jurisdiction to have him extradicted from the United States; and

(v) whether there is a likelihood that his testimony would be disclosed to the foreign government.

*Flanagan*, 691 F.2d at 121; *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1065 (3d Cir.1988).

Tr. at 219. Kikumura, however, has not substantiated that his response to these questions would in fact pose a threat of prosecution in Japan.

Despite Kikumura's failure to articulate a real and substantial fear of foreign prosecution, this fifth amendment issue need not be reached. The testimony in question is not directly relevant to the focus of the suppression hearing: whether the evidence seized from Kikumura's car on April 12, 1988 will be suppressed.[24]

When a prosecution witness refuses to respond on cross-examination, the defendant's sixth amendment right to confront the witnesses against him is implicated. *Accord, United States v. Nunez,* 668 F.2d 1116 (10th Cir.1981); *Fountain v. United States,* 384 F.2d 624, 628 (5th Cir.1967), *cert. denied,* 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968). Although the Government does not have a correlative constitutional right, when a defense witness testifies selectively, the adversarial process is compromised. As the court in *Lawson v. Murray* noted, the defendant's right to present witnesses in his own defense "does not carry with it the right to immunize the witness from reasonable and appropriate cross-examination." 837 F.2d 653, 655 (4th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988).

The striking of testimony, however, is a drastic measure which should be imposed only in extreme circumstances. *Lawson,* 837 F.2d at 655. A trial court has wide discretion to determine whether such a sanction is appropriate. *United States v. Seifert,* 648 F.2d 557, 562 (9th Cir.1980). Of primary importance in making this determination is whether the witness' selective refusal to testify so distorts the meaning and reliability of his testimony that the court's quest for truth is undermined.

In order to assess whether a motion to strike should be granted, the nature of the testimony in question must be carefully examined. *United States v. Cardillo,* 316 F.2d 606 (2d Cir.), *cert. denied,* 375 U.S.

822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963) (substantial danger of prejudice when witness refuses to testify about details of his direct testimony); *United States v. Little,* 753 F.2d 1420 (9th Cir.1985) (defendant's motion to strike denied where cross-examination related to collateral matters which had no bearing on the truth of the witness' direct testimony); *United States v. Williams,* 626 F.2d 697 (9th Cir.), *cert. denied,* 449 U.S. 1020, 101 S.Ct. 586, 66 L.Ed.2d 482 (1980) (motion to strike denied where the curtailed cross-examination related to merely collateral matters).

In this case, the questions which Kikumura refused to answer are not directly relevant to whether or not the explosives were unlawfully seized from his car. Rather, as the Government acknowledges, the questions about the Amsterdam airport incident and Kikumura's passport were intended to undermine Kikumura's credibility as a witness. Government's Brief at 29. The Government had an adequate opportunity to discredit Kikumura. For example, the Government established that Kikumura was in possession of fraudulent identification, misrepresented himself to Cieplensky, and had been arrested in Holland for possession of explosives.

Nor did Kikumura's refusal to answer certain questions unduly prejudice the Government during the hearing. Through the testimony of Detective Fuentes, the Government elicited the circumstances of the Dutch proceedings against Kikumura and the statements which he allegedly made at that time. Although the Government also argues that the questions posed to Kikumura were relevant "to show that defendant ... knew the bombs he was carrying on April 12, 1988 were extremely volatile," Government's Brief at 29, Kikumura admitted on cross-examination that he was aware of their dangerous propensity.

Because Kikumura's selective invocation of the fifth amendment did not unduly prej-

---

**24.** The refusal to answer these questions does implicate the Government's ability to impeach Kikumura's credibility. However, this refusal, in the circumstances of the suppression hearing, did not unduly prejudice the Government.

udice the Government, the Government's motion to strike is denied.

## II. *Defendant's Motion to Suppress*

At issue in this case is the legality of Cieplensky's initial stop of Kikumura, the pat down search and subsequent search of Kikumura's car. The requisite elements of proof intersect at many points, as the propriety of the stop will impact on later conduct of Cieplensky. In order to prevail on his motion, Kikumura must establish by a preponderance of the evidence that Cieplensky's conduct on April 12, 1988 violated fourth amendment safeguards. *See Lego v. Twomey,* 404 U.S. 477, 488–489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *Gereau,* 502 F.2d at 922.

### A. *The Stop*

■ The threshold issue in determining whether an unlawful search has occurred is the legality of Cieplensky's stop of Kikumura's car. The fourth amendment protects individuals against unreasonable detentions by law enforcement officers.[25] However, the governmental interest in effective law enforcement at times outweighs the individual's constitutional right to remain secure from intrusion. *United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 678, 83 L.Ed.2d 604 (1985). Under the rubric of "investigative detention" which has evolved since *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may stop a car and detain its occupants if he or she has an "articulable suspicion" that the driver has committed or is about to commit a crime. *United States v. Rickus,* 737 F.2d 360, 366 (3d Cir.1984).

According to Trooper Cieplensky, although Kikumura's behavior at the Vince Lombardi rest area aroused his suspicions, he signalled Kikumura to pull over only after observing him commit a traffic viola-

tion. Disputing Cieplensky's testimony, Kikumura argues that this traffic stop justification is mere pretext. Kikumura contends that not only was there no traffic infraction, but that during the suppression hearing, Cieplensky failed to articulate a reasonable suspicion of criminal activity which could justify a stop under *Terry.*

#### 1. *Probable Cause and the Traffic Violation*

When a police officer observes a traffic violation being committed, the officer may request the driver to pull over and order him or her out of the car. *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 111, 98 S.Ct. 330, 332, 333, 54 L.Ed.2d 331 (1977) (driving with expired license plate deemed lawful basis for stop);[26] *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (erratic driving at high rate of speed deemed lawful basis for stop). Although a traffic stop is treated as a species of investigative detention, for the purposes of fourth amendment analysis it rests more securely than a traditional *Terry* stop. *United States v. Pino,* 855 F.2d 357, 362 (6th Cir.1988). Witnessing a motor vehicle violation, the police officer has more than a reasonable and articulable suspicion of unlawful activity. He or she has probable cause to believe that a state traffic code has been violated. *Id.* 361; *United States v. Hardy,* 855 F.2d 753 (11th Cir.1988). The subsequent detention falls well within the scope of permissible fourth amendment intrusions.

When an arresting officer's version of a traffic stop is challenged by the defendant and there are no witnesses to corroborate the officer's testimony, the threshold determination of the stop's legality must be based upon the relative credibility of the two, and only, witnesses. When asked on direct examination why he stopped Kikumura's car, Trooper Cieplensky testified:

---

**25.** The Government does not dispute that directing Kikumura to pull over was a seizure within the meaning of the fourth amendment. *See Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968); *Pennsylvania v. Mimms,* 434 U.S. 106, 116 n. 2, 98 S.Ct. 330, 336 n. 2, 54 L.Ed.2d 331 (1977) (Stevens, J. dissenting).

**26.** The Court in *Mimms* believed this proposition to be too obvious to dwell on: "In this case, unlike *Terry v. Ohio,* there is no question about the propriety of the initial restrictions on respondent's freedom of movement. Respondent was driving an automobile with expired license tags in violation of the Pennsylvania Motor Vehicle Code." 434 U.S. at 109, 98 S.Ct. at 332.

"Because I had observed that vehicle committed a motor vehicle violation by coming within close proximity of other cars" while travelling at a speed of 25–30 miles per hour. Tr. at 24. Consistent with his observation, Cieplensky issued Kikumura a traffic ticket.

Courts have discounted a police officer's testimony that an investigative stop was precipitated by a traffic violation. In *United States v. Smith*, 799 F.2d 704 (11th Cir.1986), both the district and appellate courts found that the traffic statute violation relied upon by the Government did not apply "to one six-inch deviation from the road and slight 'weaving' within a single lane of an interstate highway." 799 F.2d at 709. Similarly, in *United States v. Hawkins*, 811 F.2d 210 (3d Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987), the district court did not credit police officers' testimony that the defendant was stopped because of a traffic violation. Looking at the facts surrounding the alleged traffic stop, the court noted that the officers did not detain the car immediately upon observing the violations, but rather followed the car six blocks before stopping it and neither questioned the driver concerning his erratic driving, nor issued him a ticket. 811 F.2d at 213, n. 2. Cautioning lower courts against adopting an arresting officer's post hoc justification for an investigative detention, the Third Circuit held that the legality of a stop "must be judged by the objective facts known to the seizing officers rather than by the justification articulated by them." *Id.* at 213.

In contrast to Cieplensky's description of the incident, Kikumura claims that he was driving slowly, no more than five miles per hour, and carefully at that. But Kikumura offers no explanation for why Cieplensky pulled him over. Kikumura contends deposition witness James T. Blunder informed the investigator for Kikumura he "saw nothing unusual" about Kikumura's driving. Blunder Deposition at 16–17. However, Blunder denied having made this statement when later deposed by defense counsel. *Id.* at 17–18. The testimony of the investigator was not offered. More significantly, even assuming the validity of Kikumura's contention and discounting Blunder's denials, there is no indication that Blunder's observations temporally coincided with Cieplensky's. Cieplensky's description of events is well supported. When he initially stopped Kikumura, he proceeded to ask for his driver's license, car registration and insurance, as is normally done during a routine traffic stop. Further, Cieplensky pulled Kikumura over as soon as he witnessed the infraction and Kikumura was actually ticketed for careless driving.

In reviewing the objective reasonableness of the two versions of the stop, the relative credibility of Cieplensky and Kikumura, including the lack of motive on Cieplensky's part to do anything other than recount the factual occurrences, and the obvious interest of Kikumura in having the evidence suppressed, I find Cieplensky did not offer Kikumura's motor vehicle violation as a pretext for the stop.

Kikumura suggests that the court can resolve this issue without assessing the credibility of these conflicting scenarios because it is not illegal "to travel 25–30 mph in an area with no speed limit, in the daytime, in normal weather, and come within five feet of a parked car." Defendant's Brief, 11. Kikumura argues, even accepting Cieplensky's testimony as true, he did not commit a traffic violation.

As noted, Cieplensky issued Kikumura a ticket for violating § 39:4–97 N.J.S.A., careless driving. This provision reads:

A person who drives a vehicle on a highway carelessly, or without due caution and circumspection, in a manner so as to endanger, or be likely to endanger, a person or property, shall be guilty of careless driving.

Cieplensky testified that Kikumura accelerated his car at a speed excessive for parking lot maneuvering. Cieplensky stated that by coming within five feet of other cars, Kikumura may have seriously injured someone had they suddenly exited from a car. On this point, Cieplensky stated at the hearing:

Q. Do you think the defendant would have been able to stop going at the rate of speed he was going in time if someone came out from behind one of those cars?

A. I don't believe that the defendant would have been able to control his vehicle and stop it within enough time.... Tr. at 127–128. Cieplensky's observations of Kikumura were consistent with the concept of careless driving and gave him legal basis for the stop.

While Kikumura suggests that this New Jersey traffic provision, N.J.S.A. 39:4–97, is unconstitutionally void for vagueness, Defendant's Brief, 11, its constitutional validity has been upheld. *State v. Joas*, 34 N.J. 179, 168 A.2d 27 (1961). Nevertheless, the stop of Kikumura may be sustained even without relying upon the traffic citation.

### 2. *Reasonable Suspicion of Unlawful Activity*

An investigatory stop short of an arrest is valid if based upon "a reasonable suspicion that criminal activity is afoot." *Rickus*, 737 F.2d at 365; *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. Because the concept of "reasonable suspicion" is amorphous at best and biased by an officer's subjectivity at worst, courts have required that this suspicion be founded upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an intrusion by a law enforcement official. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879.

In determining whether a stop is justified, a "court must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers." *Rickus*, 737 F.2d at 365; *see United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The officer's description of an investigative stop must be carefully scrutinized to discern reality from pretext. Providing guidance for this task, the Eleventh Circuit has suggested that "in determining whether an investigative stop is invalid as pretextual, the proper inquiry is whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation." *Smith*, 799 F.2d at 708 (emphasis in original). That is, based on an objective assessment of the facts, was the action taken justified.

Factors that enter into the calculus of reasonable suspicion are numerous and varied. *See United States v. Fouche*, 776 F.2d 1398 (9th Cir.1985), *aff'd* 833 F.2d 1284 (1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988) (defendant observed in the vicinity of a recent bank robbery suddenly accelerated his vehicle and ran a stop sign); *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (investigative detention of an individual named in a "wanted flyer"); *Hawkins*, 811 F.2d 210 (3d Cir.1987) (individuals observed entering and exiting a suspected drug den); *Rickus*, 737 F.2d 360 (defendants observed travelling through a closed business district recently hit by a spate of burglaries at 3:30 in the morning at an unusually slow speed).

Kikumura correctly points out that an officer's "inchoate and unparticularized suspicion or 'hunch'" does not meet the standards of *Terry*. *See Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1979). Perhaps Cieplensky's observations of an erratically behaving unkempt man were insufficient to warrant his stop of Kikumura. *See United States v. Gilliard*, 847 F.2d 21 (1st Cir.1988) (reasonable suspicions must be proportionate to the degree of intrusion undertaken). But this was not all that Cieplensky relied upon. Collapsing the analysis of traffic stops made pursuant to probable cause and *Terry*-type stops based upon articulation of suspicious conduct, courts have looked to the totality of circumstances in order to evaluate the legality of an officer's conduct. Within this framework, even a relatively minor traffic offense "that would not of itself lead to an arrest" may constitute a basis for an investigative stop. *United States v. Montgomery*, 561 F.2d 875, 880 (D.C.C.1977). While common traffic violations standing by themselves may not rise to the level of probable cause, they may may provide a "founded suspicion for a brief investigato-

ry stop." *Fouche* 776 F.2d at 1403. Further, when a trained police officer's relevant experience is added to this totality, a brief stop of limited instrusiveness will be justified. *Id.; United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

Under the facts presented in this case, it is apparent that after observing Kikumura, Cieplensky had a suspicion that "something was afoot." It is not unreasonable to state that Cieplensky did exactly what a good police officer would and should have done. While no single factor is dispositive, when all of the circumstances are viewed together, along with his experience as a road trooper for five years, Cieplensky had reason to pay attention to Kikumura. *Rickus,* 737 F.2d at 365. As he indicated during the suppression hearing, he was familiar with the early morning weekday population at the rest stop and Kikumura did not match that profile. Kikumura's apparently aimless "milling around" attracted Cieplensky's attention, as did Kikumura's two aborted trips towards the restaurant, his peering into the garbage can and his looking beneath a parked automobile.[27] Although Kikumura's eye contact with Cieplensky could be consistent with innocent behavior, this continued visual interaction also alerted Cieplensky.

The last ingredient in this mix is the rapid departure of Kikumura from the rest area at a time when he thought Cieplensky was no longer observing him. *See Kolender v. Lawson,* 461 U.S. 352, 366 n. 4, 103 S.Ct. 1855, 1863 n. 4, 75 L.Ed.2d 930 (1983) (Brennan, J., concurring); *Sibron v. New York,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968). This conduct of backing out of a parking space and thereafter cutting across two parking lanes at twenty five to thirty miles per hour within five feet of parked vehicles can objectively be viewed as an attempt to elude and evade further observation by Cieplensky. *See Michigan v. Chesternut,* —— U.S. ——, ——, 108 S.Ct. 1975, 1981, 100 L.Ed. 2d 565 (1988) (Kennedy, J., concurring) ("[I]t is no bold step to conclude ... that the evidence should have been admitted, for respondent's unprovoked flight gave the police ample cause to stop him"). The totality of these facts formed the basis of a reasonable, articulable suspicion of unlawful conduct. Accordingly, Cieplensky was authorized in stopping Kikumura and asking him "to explain [the mentioned] suspicious circumstances." *United States v. Brignoni–Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 42 L.Ed.2d 607 (1975).

After the stop, Cieplensky's initial contact with Kikumura was limited in duration.[28] He asked Kikumura for his driver's license and other credentials and made cursory background inquiries. Cieplensky exercised no coercion, made no physical contact with Kikumura and stayed well within the parameters of an investigative detention. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Additionally, Kikumura does not allege that his initial detention was unreasonably protracted. For all of these reasons, Cieplensky's stop of Kikumura was lawful.

### B. *The Pat Down Search*

■ Had Cieplensky's contact with Kikumura been limited to a routine traffic citation, any further action by the trooper would have been unjustified. However, as Cieplensky questioned Kikumura and reviewed his driving credentials, Cieplensky noticed that Kikumura had a significant quantity of gunpowder and shot inside of his car.

A *Terry* frisk is justified when a police officer has reason to believe that a detained individual may be armed and dangerous. 392 U.S. at 30, 88 S.Ct. at 1884.

---

**27.** When questioned on redirect whether other visitors to the rest stop ever conduct themselves in a manner similar to Kikumura's behavior on April 12, Cieplensky replied, "No, sir, that's not common behavior." Tr. at 128.

**28.** Until Cieplensky observed the gunpowder and shot in the rear of the passenger compartment, the stop of Kikumura was quite brief. *Cf. United States v. Recalde,* 761 F.2d 1448 (10th Cir.1985) (although initial stop of defendant's vehicle for speeding was proper, subsequent extended detention could not be justified by police officer's "gut instinct").

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. at 1883. This intrusion is justified by the officer's right to protect himself during the course of an investigation. *Long,* 463 U.S. at 1049, 103 S.Ct. at 3480 (protective search inside a car when a knife was viewed from outside); *United States v. Taylor,* 857 F.2d 210, 214 (4th Cir.1988) (suspect ordered out of car when police officer had reason to believe he was armed). As the Court recognized in *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), a police officer making a reasonable investigatory stop should not be denied the opportunity to protect himself from the possibility that he will be attacked. The searching officer is not required to have probable cause for an arrest in order to make a protective search for weapons. The purpose of this limited search is not to discover evidence of a crime, but "to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law." *Id.; Terry,* 392 U.S. at 29, 88 S.Ct. at 1884.

Applying the principles articulated in *Terry,* it is clear that a reasonable person in Cieplensky's circumstances also would have conducted a pat down search. Having viewed the gunpowder and shot inside of Kikumura's car, Cieplensky had a "reasonable, articulable suspicion" that Kikumura may be armed.[29] Kikumura's earlier suspicious behavior as well as his sudden attempt to exit the rest area also contributed to Cieplensky's concerns. *See United States ex rel. Richardson v. Rundle,* 461 F.2d 860, 864 (3d Cir.1972), *cert. denied,* 410 U.S. 911, 93 S.Ct. 971, 35 L.Ed.2d 273 (1973) (furtive actions and flight are signifi-

cant to a *Terry*-type inquiry); *see also United States v. Embry,* 546 F.2d 552 (3d Cir.1976), *cert. denied,* 430 U.S. 948, 97 S.Ct. 1587, 51 L.Ed.2d 797 (1977). Further, Cieplensky's pat down search was minimally intrusive, limited to a feeling along Kikumura's outer clothing for a weapon. *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884; *Cf. United States v. Santillanes,* 848 F.2d 1103, 1109 (10th Cir.1988) (officer's pat down frisk was excessively intrusive where he went beyond patting down outer clothing and reached into defendant's pockets).

Accordingly, because the importance of Cieplensky's assuring himself that Kikumura was unarmed outweighed the invasion imposed upon Kikumura's person, the pat down search was proper. 392 U.S. at 21, 88 S.Ct. at 1879.

### C. *Search of the Car's Interior*

Cieplensky contends Kikumura voluntarily consented to a search of his automobile. Kikumura denies this, but did not present a cognizable justification for discounting Cieplensky's statements, nor did he impeach the credibility of Cieplensky's account. The legality of the search, however, does not rest upon consent alone. Cieplensky's search of Kikumura's car was also justified as a protective search under *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

#### 1. *Consent*

When the Government seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving, by a preponderance of the evidence, that the consent was freely and voluntarily given. *Schenckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854; *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). The Government asserts that Kikumura's statements were entirely voluntary. In fact, according to Cieplensky, Kikumura offered to allow him to search the car.[30]

**29.** Cieplensky stated this at the hearing. "After observing (the gunpowder and shot), I had reason to believe there might possibly be a gun in the car ... (or) on (Kikumura's) possession." Tr. at 33.

**30.** In response to Cieplensky's inquiry about what the cardboard box in the back seat area contained, Kikumura stated, "souvenirs [sic]. Go ahead, check it out." Tr. at 34.

During this exchange, Kikumura was not being interrogated within the meaning of *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (interrogation consists of "words ... or actions on the part of the police that are reasonably likely to elicit an incriminating response from the suspect"), nor was Kikumura in police custody. The Supreme Court has held that traffic stops, "despite the restrictions placed on the detainee's movements, do not constitute 'custody' for purposes of *Miranda* and are closer in kind to a *Terry* stop." *United States v. Elias*, 832 F.2d 24, 26 (3d Cir.1987) (citing *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

Although he has not produced any evidence of coercion by Cieplensky, Kikumura argues that his consent was not a voluntary act, but the product of acquiesence to authority.[31] Unlawful coercion does not have to take the form of obvious police brutality. As Kikumura points out, consent obtained by "subtle coercion" may cause an involuntary act of consent to appear voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973) ("no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed."); *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir.1976).

In order to assess whether Kikumura's consent was free from any aspect of official coercion, the circumstances surrounding his consent must be scrutinized. *Schneckloth*, 412 U.S. at 229, 93 S.Ct. at 2048. Kikumura explains that as a Japanese national, unfamiliar with the English language and American procedural protections, he was not aware that he had the option to refuse Cieplensky's request. Kikumura asserts Cieplensky's conduct led him to believe that he must submit to a search. Kikumura testified,

> A. He said, hold up and raise your hand. I rose my hands. Then he patted on me.

> \*     \*     \*     \*     \*     \*

> A. I asked him to explain. He said he was a policeman. He said you must listen to the policeman. You have to obey the policeman. He said while you are in America, you have to obey the American policeman. He addressed me in that atmosphere.

Tr. at 208.

Even though Kikumura may have been unfamiliar with American police practices, his knowledge of whether he had the right to refuse Cieplensky's request is not determinative. *Schenckloth*, 412 U.S. at 231–34, 93 S.Ct. at 2049–51. Proof that the defendant was aware of his right to refuse consent is not a necessary prerequisite to demonstrating "voluntary" consent. *Id.* at 232–33, 2050; *Hubbard v. Jeffes*, 653 F.2d 99, 104 (3d Cir.1981). Although consent to a search must be voluntary, the strict standard of voluntariness under *Miranda* has been rejected in this fourth amendment context. *Schenckloth*, 412 U.S. at 231–232, 93 S.Ct. at 2049–50; *United States v. Scott*, 590 F.2d 531, 534 (3d Cir.1979).[32] For this reason, police officers are not required to give *Miranda*-type warnings before conducting a search.

Although Kikumura asserts his consent was the result of subtle coercion, there is no indication that the encounter between Kikumura and Cieplensky was not the voluntary cooperation of a detained individual in response to noncoercive questioning, as established by Cieplensky. *Santillanes*, 848 F.2d at 1106. Kikumura has failed to articulate the manner in which he was "coerced." He does not allege that after Cieplensky asked to search his car,

---

**31.** Kikumura also argues that the consent was invalid as the product of an unlawful pat down search. Because the pat down has been held lawful, this argument need not be addressed.

**32.** As the court in *Jeffes* explained, "so long as the 'waiver of the right to refuse consent need not be knowing and intelligent, the person whose consent is sought need not be made aware of the full panoply of constitutional protections available to a criminal suspect who is undergoing custodial interrogation." 653 F.2d at 104.

Kikumura refused and Cieplensky overbore his will and initiated the search. Kikumura's alleged belief that he had no choice other than to allow Cieplensky to search his automobile does not negate the validity of his consent in these circumstances. The Government has established by a preponderance of the evidence that Kikumura freely and voluntarily gave his consent for the search.

### 2. *Protective Search*

Although it has been found that Kikumura voluntarily consented to the search of his car, Cieplensky's conduct was also justified as a protective search. In *Michigan v. Long,* the Supreme Court addressed the question of "the authority of a police officer to protect himself by conducting a *Terry*-stop search of the passenger compartment of a motor vehicle during the lawful investigatory stop of the occupant of the vehicle." 463 U.S. at 1037, 103 S.Ct. at 3474.

■ When a car has been legitimately stopped and there is probable cause to believe it contains contraband, the police may conduct a search "of every part of the vehicle and its contents that may conceal the object of the search." *U.S. v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed. 2d 572; *United States v. Orozco,* 715 F.2d 158, 160 (5th Cir.1983). However, just as a lesser showing will justify a temporary investigative stop and pat down under *Terry,* if the detaining officer has a reasonable suspicion that there are weapons in the automobile, he may lawfully search its interior. *Long,* 463 U.S. at 1049, 103 S.Ct. at 3480.

Investigative detentions involving suspects in vehicles are "especially fraught with danger to police officers." *Id.* at 1047, 103 S.Ct. at 3479. For this reason, the Court held in *Pennsylvania v. Mimms* that a police officer may order a person out of a car during a traffic violation stop and frisk him if the officer has a reasonable belief that the person is "armed and dangerous." 434 U.S. at 113, 98 S.Ct. at 334. This rationale has been extended to authorize the protective search of a car's interi-

or. When an officer believes that an individual detained during a traffic stop poses a danger "and that danger may arise from the possible presence of weapons in the area surrounding a suspect" the officer may conduct a search of the automobile. *Long,* 463 U.S. at 1049, 103 S.Ct. at 3480.

This does not authorize law enforcement officials to conduct an automobile search whenever they conduct an investigative stop. *Id.* at 1049, n. 14, 103 S.Ct. at 3481, n. 14. Governed by the same principles as the initial *Terry* stop, this search must be based upon "specific and articulable facts which, taken together with the rationale inference from those facts," reasonably warrant the officer to believe that the suspect may gain immediate control of weapons. *Id.* at 1049, 103 S.Ct. at 3480. Thus, the rationale of *Terry* allows for brief investigative detentions but recognizes that they may materialize into more, i.e. a stop may lead to a frisk which may lead to a search which may in turn warrant an arrest.

■ Under the facts of this case, once Cieplensky observed the large quantity of gunpowder and shot in the car, it was reasonable for him to believe that Kikumura might also have a weapon on his person or in his car. Kikumura points out that gunpowder and shot are perfectly legal. Defense Brief at 32. However, the Supreme Court has expressly rejected the view that the validity of a *Terry* search depends on whether possession of the weapon is lawful. *Id.* at 1052, n. 16, 103 S.Ct. at 3482, n. 16; *Adams,* 407 U.S. at 146, 92 S.Ct. at 1923. In *Long,* the detaining officer noticed only a hunting knife when he stopped the defendant for driving erratically. Kikumura had a weapons potential several times greater than one hunting knife; he had enough ammunition for several shot guns, more than one person would need for an entire hunting season.

Furthermore, had Kikumura not been arrested, he would have been permitted to reenter his automobile and would then have had access to any weapons which might have been located within the car. *Long,* 463 U.S. at 1051–52, 103 S.Ct. at 3481–82.

At this point, Cieplensky would have been vulnerable. Accordingly, there was reason to infer that Kikumura posed a danger to Cieplensky's safety. *See United States v. Powless*, 546 F.2d 792, 795 (8th Cir.1977).

### D. *Probable Cause to Search Remainder of Car*

In order to determine whether there is probable cause to conduct a warrantless search, the police officer must consider the totality of circumstances surrounding the defendant's detention. *Ross*, 456 U.S. at 800, 102 S.Ct. at 2160. Cieplensky's observation of the gunpowder, shot and cylindrical objects, when coupled with Kikumura's curious behavior, apparent attempt to flee, and traffic violation, sufficiently supported his suspicions about Kikumura to give him a basis to search the passenger area of the car. After he discovered the bombs, he had probable cause to search the entire car; Cieplensky was authorized to search not only the entire vehicle but also any containers found within it that might contain contraband. *Id.* at 825, 102 S.Ct. at 2173; *Orozco*, 715 F.2d at 160; *Rickus*, 737 F.2d at 367. A police officer who has "reasonable or probable cause for believing that the automobile which he stopped ... has contraband therein" may search the car's interior pursuant to the automobile exception to the warrant requirement. *United States v. Schecter*, 717 F.2d 864, 869 (3d Cir.1983) (quoting *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

After discovering the bombs, Cieplensky had probable cause to arrest Kikumura. Cieplensky's more thorough post-arrest search of the automobile and trunk, then, was also justified as a search incident to arrest. *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Schecter*, 717 F.2d 864. As the court held in *Belton*, the lawful custodial arrest of an individual "justifies the infringement of any privacy interest the arrestee may have." 453 U.S. at 461, 101 S.Ct. at 2864. This search is justified along a similar rationale as a protective search under *Michigan v. Long*. After Kikumura's car was impounded and in police custody, any in-

ventory search made was also permissible. *Michigan v. Thomas*, 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982).

### Conclusion

In conclusion, Cieplensky's stop, pat down and search of Kikumura's car are well supported by a number of arguments. Kikumura's suspicious behavior at the Vince Lombardi rest area, his hasty attempt to depart and subsequent motor vehicle violation all provided Cieplensky with an initial justification to detain Kikumura. After observing the gunpowder, shot and cylindrical objects in Kikumura's car, Cieplensky had a reasonable suspicion, if not probable cause, to believe that Kikumura may have been in possession of a weapon.

While the fourth amendment mandates an individual's expectation of privacy be respected, it does not require a police officer "who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams*, 407 U.S. at 145, 92 S.Ct. at 1922. On the contrary, "it may be the essence of good police work to adopt an intermediate response." *Id.* This is precisely what Cieplensky did. His stop, pat down and search of Kikumura's car were reasonable under the circumstances and did not impermissibly infringe on Kikumura's rights under the fourth amendment.

Given this strong showing, application of the sanction of suppression would enforce no "ideals of governmental rectitude," and would only "generat[e] disrespect for the law and administration of justice." *United States v. Taylor*, at 215 (quoting *United States v. Payner*, 447 U.S. 727, 734, 100 S.Ct. 2439, 2445, 65 L.Ed.2d 468 (1980) and *Stone v. Powell*, 428 U.S. 465, 491, 96 S.Ct. 3037, 3051, 49 L.Ed.2d 1067 (1976)).

Accordingly, Kikumura's motion to suppress is denied; for the reasons previously indicated, the Government's application to strike Kikumura's testimony is denied.